609 So.2d 10 (1992)
Edward Eugene RAGSDALE, Appellant,
v.
STATE of Florida, Appellee.
No. 72664.
Supreme Court of Florida.
October 15, 1992.
William G. Dayton, Dade City, for appellant.
Robert A. Butterworth, Atty. Gen. and Robert J. Krauss, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Edward Eugene Ragsdale appeals his convictions of first-degree murder and armed robbery and the trial court's imposition of the death penalty. We have jurisdiction[1] and affirm Ragsdale's convictions and sentences, including the death sentence.
The relevant facts reflect that on the evening of January 1, 1986, Samuel Morris heard noises emanating from his neighbor Ernest Mace's mobile home. After hearing what he described as "slamming furniture," Morris went over to Mace's home and observed someone in the kitchen. Morris knocked on Mace's door several times and, eventually, two men ran out of the back of the mobile home. Morris gave chase to one of the men, but could not *11 catch him. He returned to Mace's mobile home and found Ernest Mace badly beaten with his throat cut "from ear-to-ear." Morris asked Mace who his attackers had been, and, although unable to talk, Mace indicated by moving his head that he knew who his attackers had been. Morris testified that he asked Mace if it had been an individual named Mark, to which Mace responded with a negative motion. Emergency rescue workers arrived shortly thereafter, but Mace died enroute to the hospital.
Investigating law enforcement officers concluded from their preliminary investigation that Ragsdale, together with Leon Illig, was involved in the murder. They obtained a statement from Carl Florer, the husband of Ragsdale's cousin, that on the day following the murder Ragsdale told him that he had "cut the old man's throat." Bulletins were then sent out notifying law enforcement agencies that Ragsdale and Illig were sought in connection with a murder investigation.
On January 12, 1986, Ragsdale was arrested in Alabama on a fugitive warrant issued in 1985 when his parole officer reported that Ragsdale had left the state without permission. While processing Ragsdale's arrest, Alabama authorities discovered that he was wanted as a suspect in the Mace murder.
On January 16, 1986, a grand jury indicted Illig and Ragsdale for first-degree murder and armed robbery. Prior to Ragsdale's trial, Illig pleaded nolo contendere and received a sentence of life imprisonment. Shortly before Ragsdale's trial, the trial judge granted the State's motion in limine for an order directing the defense to make no attempt to inform the jury of Illig's conviction and sentence during voir dire and the guilt phase of the trial.
During the course of the trial, the victim's neighbor, Samuel Morris, testified as previously indicated. Carl Florer and Ragsdale's brother, Terry Ragsdale, testified that the appellant stated that he had hit the victim several times and then cut his throat. Terry Ragsdale testified that the appellant had said that the person killed was named Ernest Kendricks. Terry Ragsdale also identified a knife which the appellant had stated was the murder weapon.
Cindy LaFlamboy, Illig's girlfriend and roommate, stated that Ragsdale and Illig borrowed her car on the night of the murder in order to allegedly "collect some money" and stop by a liquor store. She testified that, approximately forty-five minutes later, Ragsdale returned to her home by himself. She stated that Ragsdale was in a very upset and nervous state. LaFlamboy testified that when Ragsdale arrived, he stated that "I hope that Leon didn't get caught." LaFlamboy testified that, when Illig returned, clad only in shorts, he and Ragsdale quarreled over "the need to kill that man." She also testified that she saw Ragsdale cleaning blood from a pocket knife in her kitchen sink. The following day, when news of the murder appeared in the newspaper, LaFlamboy took Illig to the bus station and then drove with Ragsdale to Alabama. LaFlamboy testified that, during their drive to Alabama, Ragsdale repeated that he had cut the victim's throat. On cross-examination, however, LaFlamboy testified that there were no bloodstains on Ragsdale's clothing.
The State presented two confessions obtained by investigators. The first confession was obtained by a sheriff's deputy sent to question Ragsdale while in custody in Alabama. Evidence was presented that Ragsdale, after being advised of his rights, admitted going to the victim's house with the intent to rob him. Ragsdale stated to the sheriff's deputy that he left Illig with the victim and, upon returning, found blood covering the floor. In this confession, Ragsdale stated that, after reentering the room, Illig declared that he had murdered the victim because the victim could have identified them. Finally, Ragsdale described fleeing the scene in LaFlamboy's car without Illig and eventually returning to her house, where Illig later arrived, scantily clad. Ragsdale also repeatedly declared that he had not been an active participant in the killing and described attempts by Illig's family to get their son out of the country.
*12 In his second confession, Ragsdale admitted striking the victim and cutting him with a knife when he believed the victim was reaching for a gun. However, Ragsdale stated that, after he cut the victim, Illig took the knife from him, said, "Let me show you how it's done," and inflicted the fatal cut. In this confession, Ragsdale also admitted owning the murder weapon, robbing Mace, and giving Illig's girlfriend the stolen money.
After the State rested, defense counsel attempted to call Illig as a witness. Illig asserted his Fifth Amendment rights and refused to testify. The trial judge then denied a request by Ragsdale's counsel to allow Illig to plead the Fifth Amendment in the presence of the jury. The defense rested and the jury returned guilty verdicts against Ragsdale to all of the offenses charged.
During the penalty phase of the trial, the State again presented LaFlamboy, who testified that Illig was not acquainted with the victim and that Ragsdale had admitted killing the victim because he could identify Ragsdale. On cross-examination, LaFlamboy stated that she was Illig's fiancee and that she had helped Illig and Ragsdale leave the state. She also stated that Ragsdale had no blood on his clothing when he returned to her apartment on the night of the murder.
In mitigation, Ragsdale presented the testimony of his brother, who stated that he had known Ragsdale for almost thirty years, and that Ragsdale was a follower, not a violent person. Ragsdale's brother also stated on cross-examination that Ragsdale was a bully, became mean when on dope, and "could do anything if he was mad enough." He also noted that the victim was a family friend and thought that his brother's statement that he had cut the man's throat was false. He also testified that Ragsdale boasted a lot and that much of what he said was unreliable.
After commencing its deliberations, the jury asked the trial judge two questions. First, the jurors asked the judge whether it is "unjust  just to sentence the defendant to a greater sentence (death) than the accomplice, if based on the testimony heard by the jurors, the jurors believe that the defendant may have had a lesser part in the murder?" The trial judge, without objection, reread to the jury the following portion of the jury instructions:
Deciding a verdict is exclusively your job. That's true in this phase of the trial, as well as the earlier phase. I cannot participate in that decision in any way. In fact, you should please disregard, again, anything I may have said or done, at any time during either phase of this trial, that made you believe I preferred one verdict over another.
In its second question, the jury requested the legal definition of "nolo contendere." In response to the second question, the judge read the definition of nolo contendere from Black's Law Dictionary. One of the jurors asked if the State had the right to rebut defense counsel's remarks in the penalty phase and was told "no." The same juror then asked whether the question regarding the fact that Illig received a life sentence could be reworded. The trial judge interrupted the juror and stated that the court could not assist any further in the matter. The jury returned to its deliberations and returned with a verdict recommending the death penalty by a vote of eight to four.
The court, in accordance with the jury recommendation, sentenced Ragsdale to death. The court found the following three aggravating factors: (1) the crime was committed while Ragsdale was on parole, under a sentence of imprisonment; (2) the murder occurred during a robbery and was committed for monetary gain; and (3) the crime was extremely wicked, evil, atrocious, and cruel. The court specifically supported the last finding by referring to the defendants' ages, the severity of the cut, and the evidence of defensive wounds on the victim. The trial court found no mitigating evidence and addressed the question of the differences in culpability between Illig and Ragsdale in its findings. In its findings, the trial court stated:
There were differences in the culpability of the two defendants for this murder. *13 The credible evidence indicated that while Mr. Illig struck Mr. Mace, it was Mr. Ragsdale that pitilessly cut his throat. In fact, the testimony of Ms. LaFlamboy indicated that Illig was upset that Ragsdale had killed Mr. Mace and considered the killing to be unnecessary.
Furthermore, there was a difference in the criminal histories of these two defendants. Mr. Illig was only 17 years old at the time of the killing, while Mr. Ragsdale was 25 years old. Mr. Illig had no prior significant criminal record, while Mr. Ragsdale had been confined to the Alabama prison for commission of a felony and had absconded from parole from that state.
Finding that no mitigating circumstances existed to offset the aggravating circumstances, the trial court imposed the death penalty.
In his appeal, Ragsdale claims that: (1) the trial court erred by not allowing the defendant to question prospective jurors on voir dire as to their willingness to impose a similar penalty as that imposed upon a codefendant if they found the defendant equally or less culpable; (2) the trial court erred by imposing the death penalty where the jury, although recommending death, indicated that Ragsdale was less culpable than his codefendant, who was sentenced to life imprisonment; (3) the State is obligated to provide notice in the charging document of the aggravating circumstances intended to be used in the penalty phase of the trial; (4) section 921.141, Florida Statutes (1987), is unconstitutional because it intrudes on the rule-making authority of the judiciary; (5) sections 782.04 and 921.141, Florida Statutes (1987), are unconstitutionally vague and overbroad; and (6) sections 782.04 and 921.141, Florida Statutes (1987), are unconstitutional in that they call for cruel and unusual punishment.
In his first claim, Ragsdale challenges the validity of his conviction and sentence because the trial court limited his voir dire by denying him the opportunity to question potential jurors as to their willingness to sentence Ragsdale differently from a codefendant found to be equally or less culpable. We find that the record reflects that Ragsdale's counsel had sufficient latitude to question the jurors to obtain fair and impartial jurors. Additionally, the sentencing jury was fully aware of the sentence received by Illig, and defense counsel was not limited in the manner in which he could assert that his client was less culpable in the commission of the murder. We conclude that no error was committed by the trial judge in this instance.
Next, Ragsdale contends that the trial judge erred in imposing the death sentence when the sentencing jury had indicated that Ragsdale was less culpable than a codefendant who was sentenced to life imprisonment. Ragsdale bases this claim on the question asked by the sentencing jury concerning whether it is unjust to sentence a defendant to a greater sentence than an accomplice, if the jurors believed that this defendant may have had a lesser part in the murder. Ragsdale asserts that the trial judge's response gave the jury a false impression that it was bound by law to place no weight upon the conclusion that Ragsdale was the less culpable of the two defendants. The record reflects that Ragsdale's counsel specifically agreed with the trial judge that rereading the instruction stating that "deciding a verdict is exclusively" the jury's job and in which the court cannot participate. Counsel did not suggest to the court a different response and, on the basis of the record, we find no error.
Ragsdale also asserts that the effect of the trial court's response resulted in the jury's not knowing it could consider Illig's sentence as nonstatutory mitigating evidence during the penalty phase. We disagree and find that the jury instruction, coupled with the closing arguments of both parties and the nature of the questions asked by the jury, indicates that the relative culpability of Ragsdale's codefendant was in the minds of the jurors and properly considered in recommending the sentence. O'Callaghan v. State, 542 So.2d 1324 (Fla. 1989); Gafford v. State, 387 So.2d 333 (Fla. 1980); Malloy v. State, 382 So.2d 1190 (Fla. 1979); Witt v. State, 342 So.2d 497 (Fla. 1977), cert. denied, 434 U.S. 935, 98 S.Ct. *14 422, 54 L.Ed.2d 294 (1977). We also note that there is evidence in this record that Ragsdale stated that he had committed the murder.
In his fourth claim, Ragsdale asserts that sections 782.04 and 921.141, Florida Statutes (1987), are unconstitutional. While we reject this claim as being without merit, we note that since the release of our slip opinion and while this case was pending rehearing, the United States Supreme Court held that our former jury instruction on the "especially wicked, evil, atrocious, and cruel" aggravating factor was insufficient in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). We find that, although this instruction was given to the jury, this issue was neither preserved at trial nor raised in this appeal. See Sochor v. Florida, ___ U.S. ___, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (claim of unconstitutional vagueness of "heinous, atrocious, or cruel" instruction will not be heard by the United States Supreme Court where Florida Supreme Court finds it unpreserved).
In addition, were we to address this issue, we find that the reading of the instruction was harmless error beyond a reasonable doubt. The record reflects that there are two remaining valid aggravating factors. No mitigating factors were established at trial, and we conclude that the instruction struck down in Espinosa could not have affected the jury's recommendation of death in this cause. Accordingly, the reading of the invalid instruction was, beyond a reasonable doubt, harmless error.
We find the remainder of the issues raised by Ragsdale without merit and do not require discussion. Accordingly, we affirm Ragsdale's convictions and sentences, including the imposition of the death penalty.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.