798 So.2d 713 (2001)
Edward Eugene RAGSDALE, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-414.
Supreme Court of Florida.
October 18, 2001.
Mark S. Gruber, Assistant CCRC-Middle, Office of the Capital Collateral Regional CounselMiddle Region, Tampa, FL, for Appellant.
*714 Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Edward Eugene Ragsdale appeals the circuit court's order denying his motion to vacate judgment and sentence filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), (9) Fla. Const. We reverse the order denying relief and remand for a new sentencing proceeding.
The relevant facts of this crime were set forth in Ragsdale v. State, 720 So.2d 203, 204 (Fla.1998):
In 1986, Edward Eugene Ragsdale and Leon Illig were arrested for the armed robbery and first-degree murder of Ernest Mace (the victim). The victim had been badly beaten and his throat had been slit. Illig pleaded nolo contendere and received a sentence of life imprisonment. Illig invoked the Fifth Amendment when called to testify at Ragsdale's trial. Ragsdale admitted striking the victim and cutting him with a knife but asserted that Illig inflicted the fatal cut. Three individuals testified at trial that Ragsdale admitted he had committed the murder.
Ragsdale was convicted as charged and the jury recommended death by an eight-to-four vote. The trial judge followed that recommendation, finding no factors in mitigation and three factors in aggravation: (1) that the murder was committed while Ragsdale was on parole (under sentence of imprisonment); (2) that the murder was committed during a robbery and for monetary gain; and (3) that the murder was especially heinous, atrocious, and cruel. The facts of the crimes are set forth in more detail in Ragsdale v. State, 609 So.2d 10 (Fla. 1992).
In Ragsdale's first 3.850 collateral appeal, we affirmed in part and reversed in part the circuit court's order summarily denying relief. See Ragsdale, 720 So.2d at 208. Specifically, we found:
With regard to the penalty phase, however, we conclude that an evidentiary hearing was required. During the penalty phase, defense counsel put on only one witness, Ragsdale's brother, who provided minimal evidence in mitigation. That witness had also testified on behalf of the State during the guilt phase. Additionally, the witness, when cross-examined by the State during the penalty phase, testified that it did not surprise him that his brother committed the murder and he provided other derogatory information about Ragsdale.
In Ragsdale's rule 3.850 motion, he states that testimony was available to show that Ragsdale's life was marked by poverty and deprivation and that he suffered from a lifetime of drug and alcohol addiction, yet no witnesses were called by the defense to present this testimony. More importantly, he contends that defense counsel never had him examined by a competent mental health expert for purposes of presenting mitigation. He asserts that he has now been examined by a mental health expert who has found that he suffers from organic brain damage; is mentally retarded; has severe language and listening comprehension difficulties; and has difficulties with concentration, attention, and mental flexibility. Additionally, he alleges the evidence will show that his ability to reason and exhibit appropriate judgment, as well as determine and assess the long-term consequences of his actions, is also substantially impaired.
. . . .
We conclude that Ragsdale has stated sufficient allegations of mitigation that *715 are not conclusively refuted by the record to warrant an evidentiary hearing to determine whether counsel was ineffective in failing to properly investigate and present this evidence in mitigation.
Ragsdale, 720 So.2d at 208. Accordingly, we directed that the circuit court "hold ... an evidentiary hearing on the contentions that Ragsdale's trial counsel was ineffective for failing to properly investigate and present evidence in mitigation and that Ragsdale was deprived of an effective mental health expert." Id. at 209. The circuit court conducted the evidentiary hearing and denied Ragsdale's 3.850 motion.
This appeal follows, in which Ragsdale claims that: (1) his trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase; and (2) the circuit court committed reversible errors in conducting the evidentiary hearing. As we find Ragsdale's trial counsel ineffective for his failure to investigate and present mitigating evidence at the penalty phase of Ragsdale's trial, we do not address the errors allegedly committed by the circuit court in conducting the evidentiary hearing.
The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), set forth the standards to be applied by courts in analyzing claims of ineffective assistance of counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
See also Cherry v. State, 781 So.2d 1040, 1048 (Fla.2000); State v. Riechmann, 777 So.2d 342, 349 (Fla.2000); Rutherford v. State, 727 So.2d 216, 219 (Fla.1998).
As to the first prong of the Strickland test, the Supreme Court stated that "the defendant must show that counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Under the second prong of the test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. The Supreme Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id. With respect to claims of ineffective assistance of counsel, we defer to the trial court's findings of fact and review, as questions of mixed law and fact, whether counsel was ineffective and whether the defendant was prejudiced by any ineffective assistance of counsel. See Stephens v. State, 748 So.2d 1028 (Fla. 1999).
Specifically, Ragsdale argues that his trial counsel was ineffective for failing to investigate and present evidence concerning Ragsdale's abusive childhood environment, drug and alcohol abuse, history of head traumas, and mental mitigation. Ragsdale also claims that his counsel was ineffective in presenting Terry Ragsdale, Ragsdale's brother, as a mitigation witness. The circuit court denied relief on these claims, and the entirety of its order states:

*716 This cause coming on to be heard on the Order of the Florida Supreme Court directing this court to conduct an evidentiary hearing regarding penalty phase issues raised by EDWARD EUGENE RAGSDALE, that his trial counsel was ineffective for failure to properly investigate and present evidence in mitigation and that he was deprived of an effective mental health expert.
Pursuant to this directive, this court has received evidence and heard argument of counsel. This Court recommends to the Supreme Court that petitioner's Motion for Post Conviction Relief be denied. This Court finds that EDWARD EUGENE RAGDALE'S trial counsel did not abuse his duties in any fashion, nor was his representation inadequate, nor did it cause prejudice to EDWARD EUGENE RAGSDALE which could have been avoided by any other type of representation. The mitigating evidence alluded to by EDWARD EUGENE RAGSDALE was not available to his trial counsel, and the psychological factors discussed during this hearing were considered by trial counsel.
This Court further finds that even had this mitigating information been available, there is no reasonable possibility that the outcome of the original sentencing hearing would have been different.
State v. Ragsdale, No. 86-91 CFAES (Fla. 6th Cir. Ct. order filed Jan. 21, 2000). Contrary to the circuit court's summary order, our reading of the record causes us to conclude that Ragsdale's counsel was ineffective as a matter of law and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. The record establishes that counsel essentially rendered no assistance to Ragsdale during the penalty phase of trial. Thus, as the penalty phase of Ragsdale's trial was not subjected to meaningful adversarial testing, "counsel's errors deprived [defendant] of a reliable penalty phase proceeding." Hildwin v. Dugger, 654 So.2d 107, 110 (Fla. 1995).
"[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Riechmann, 777 So.2d at 350 (citing Rose v. State, 675 So.2d 567, 571 (Fla.1996)). As we pointed out in remanding for an evidentiary hearing, at the penalty phase of Ragsdale's trial counsel put on only one witness, who provided minimal evidence in mitigation. See Ragsdale, 720 So.2d at 208. The record at the 3.850 evidentiary hearing conclusively establishes that counsel failed to investigate and present at the penalty phase an abundance of potential mitigating evidence.
Ragsdale produced at the evidentiary hearing three siblings by live testimony and two siblings through depositions to perpetuate testimony who testified as to Ragsdale's abusive childhood environment.[1] The testimony of Ragsdale's siblings provided a horrific account of Ragsdale's early life. Ragsdale grew up in Zephyrhills, Florida, in a family which consisted of his parents and his three brothers.[2] *717 Early in Ragsdale's life, his father became disabled and thus was unemployed throughout most of Ragsdale's childhood. Hence, Ragsdale grew up as a member of an impoverished family that moved about from trailer to trailer in Zephyrhills, Florida. Ragsdale's father dominated the household, and Ragsdale's mother followed orders without argument. If Ragsdale's mother talked back or attempted to stand up for her children, she would be beaten by Ragsdale's father.
In addition, Ragsdale's father would become more violent upon taking his medication. The Ragsdale brothers, particularly appellant, were frequently beaten by their father with fists, tree limbs, straps, hangers, hoses, walking canes, boards, and the like, until bruises were left and blood was drawn. As punishment, Ragsdale and his brothers might be made to fight until blood was drawn or handcuffed to a pole for a period lasting from ten minutes to hours. Furthermore, Ragsdale's father always carried a pistol, which he once pulled on Ragsdale's mother and twice fired at Ragsdale. The abuse was such that Ragsdale began to run away from his home to his aunt's house at the age of eight. At the age of about fifteen or sixteen, without ever advancing past the seventh grade, Ragsdale permanently left his home by moving in with a cousin.
Ragsdale's siblings also provided evidence as to Ragsdale's extensive drug and alcohol abuse. Ernie Ragsdale, Ragsdale's younger brother, and Byron Ragsdale, Ragsdale's cousin, described Ragsdale's abuse of an assortment of drugs and other substances, beginning with Ragsdale's sneaking of his father's medication pills at age eight, to Ragsdale's abuse of inhalants, marijuana, and cocaine. The siblings also testified as to various injuries to the head suffered by Ragsdale. While playing as a child, Terry Ragsdale, Ragsdale's brother, mistakenly blinded Ragsdale in one eye by shooting an arrow into it. At the age of twelve or thirteen, Ragsdale was involved in a car accident in which the car hit a tree, and Ragsdale was propelled through the front windshield. At the age of sixteen or seventeen, Ragsdale was struck in the head with a metal pipe. Ernie and Byron testified that after these accidents, Ragsdale would complain about severe headaches. Also, after these accidents, Ragsdale went through behavioral changes in which he would violently "snap" over anything.
Ragsdale's childhood and history of drug and alcohol abuse were not presented to the penalty phase jury. Ragsdale's history of head trauma was presented in a very limited fashion. Terry Ragsdale, Ragsdale's brother, the only mitigation witness that testified on behalf of Ragsdale at the penalty phase, testified that he blinded Ragsdale in one eye by accidentally shooting him with an arrow and that Ragsdale was involved in a car accident in which his head went through the windshield. But it was not until the postconviction evidentiary hearing that evidence was presented from witnesses as to the behavioral changes and headaches Ragsdale suffered after these accidents.
No expert testimony was presented at the penalty phase regarding how the child abuse, the drug and alcohol abuse, and particularly the history of head trauma may have contributed to Ragsdale's psychological status at the time of the murder. At the evidentiary hearing, Ragsdale established the existence of mental mitigating evidence through the expert testimony of a forensic psychologist, Dr. Robert Berland. Dr. Berland's conclusions were based on interviews with Ragsdale and on *718 Dr. Berland's review of relevant documentation such as police reports, witness statements, depositions, and prison records. Dr. Berland conducted various tests including a Minnesota Multiphasic Personality Inventory ("MMPI"), in order to measure symptoms of mental illness, and a Wechsler Adult Intelligence Scale test ("WAIS"), in order to detect brain injury. Dr. Berland also interviewed Ragsdale's siblings, reviewed the raw data of the evaluations conducted by the State expert, Dr. Sidney Merin, and reviewed Dr. Don Delbeato's evidentiary hearing deposition and psychological report ("Delbeato report"), which was produced at the time of the trial.[3] Dr. Berland concluded that Ragsdale was psychotic at the time of the offense, and thus the statutory mitigating circumstances of extreme mental or emotional disturbance and inability to conform to the requirements of law applied in the instant case. Dr. Berland also identified a list of nonstatutory mitigating factors including organic brain damage, physical and emotional child abuse, history of alcohol and drug abuse, marginal intelligence, depression, and a developmental learning disability.
In rebuttal to Dr. Berland's testimony, the State presented Dr. Merin, a clinical psychologist specializing in neuropsychology. Dr. Merin based his conclusions on fifteen psychological tests, a clinical interview of Ragsdale, and a review of Ragsdale's records. In essence, Dr. Merin disagreed with Dr. Berland's conclusion that Ragsdale was psychotic and suffered organic brain damage. Dr. Merin offered no opinion as to the applicability of the statutory mental mitigators. Dr. Merin did, however, testify as to the existence of mitigating evidence which was not presented at the penalty phase of Ragsdale's trial. Dr. Merin's tests revealed that Ragsdale had a severe learning disability and that Ragsdale's IQ score was in the borderline retarded range. While Dr. Merin concluded that Ragsdale was not psychotic, he diagnosed that Ragsdale's brain was impaired and that Ragsdale had a personality disorder with paranoid features. Thus, the conclusion is inescapable that there was available evidence from experts which would have supported substantial mitigation but which was not presented during the penalty phase.
We have also examined the explanations given by counsel concerning his representation of Ragsdale. See Rose, 675 So.2d at 572 ("[W]e must also consider the reasons advanced at the evidentiary hearing as to why ... counsel did not investigate and present available mitigating evidence at the penalty phase."); Hildwin, 654 So.2d at 109-10. Counsel was appointed to the case after various lawyers had withdrawn. Although counsel had five years of experience in criminal defense work in Georgia and worked for several months as an assistant state attorney before entering into private practice, this case was his first and last capital murder case. The only assistance counsel received with the case was from his wife.[4] Counsel testified that, as all but one deposition needed to be completed, *719 he felt that the essential discovery had been done and that all the preparation he needed to do was to learn the material to try the case. Indeed, the record reflects that counsel's entire investigation consisted of a few calls made by his wife to Ragsdale's family members. Counsel did not know who his wife contacted or the content of the conversations between his wife and the individuals contacted. Further, counsel did not talk to any family members himself; he only understood from his wife that Ragsdale's family was not particularly helpful or interested.
We find that the present case is distinguishable from our recent cases in which we have found that defendant has not met his burden in establishing that trial counsel was ineffective. In Cherry, we affirmed the circuit court's denial of defendant's ineffectiveness claim where defendant refused to provide any names of potential mitigation witnesses and prohibited his attorney from making arguments that were inconsistent with maintaining defendant's innocence. See 781 So.2d at 1050. In Cherry, defendant's counsel made a reasonable tactical decision to present evidence of mental mitigation to the jury by introducing the expert's report into evidence at the penalty phase in order to avoid the State's cross-examination of the expert. Additionally, in Cherry, we held that in light of conflicting expert opinions, the circuit court's factual decision to credit the opinion of the State expert rather than defendant's expert was supported by competent, substantial evidence. In Asay v. State, 769 So.2d 974, 988 (Fla.2000), we affirmed the circuit court's rejection of defendant's ineffectiveness claim where the attorney was informed of the defendant's abusive background and, after contacting potential witnesses, made a strategic decision to forego the presentation of nonstatutory mitigation to avoid "open[ing] the door to damaging cross-examination regarding [defendant's] violent past." Id. at 988. In Asay, we also found that defendant's attorney was not deficient where after receiving an initial unfavorable report from the examining psychologist the attorney decided to discontinue his investigation for mental mitigation evidence. See id. at 986; see also Jones v. State, 732 So.2d 313, 320 n. 5 (Fla.1999) (affirming trial court's finding that counsel had made reasonable tactical decision to forego further investigation of mental health mitigation evidence after receiving initial unfavorable diagnosis).
In contrast to Cherry, we find no evidence that Ragsdale was uncooperative or that he precluded his counsel from investigating and presenting evidence in mitigation. In addition, Ragsdale's siblings testified that they were never contacted and that they would have testified if they had been contacted at the time of Ragsdale's trial. Ernie Ragsdale, Ragsdale's younger brother, had been deposed by Ragsdale's predecessor counsel and even came to Ragsdale's trial pursuant to a State subpoena and, after talking to prosecutors, was released from the subpoena. Ernie, however, was never contacted by counsel. Byron Ragsdale, Ragsdale's cousin, lived in Pasco County at the time of Ragsdale's trial, yet he was never contacted by counsel. Darlene Parker, Ragsdale's cousin, and Byron drove eight hours from Georgia to Pasco County, Florida, to testify on Ragsdale's behalf. Rebecca Lockhart, Ragsdale's aunt, and Sheila Adams, Ragsdale's cousin, provided corroborative testimony of Ragsdale's child abuse by way of depositions to perpetuate testimony. Therefore, the evidence establishes that these witnesses would have been available if counsel had conducted a minimal investigation. See Riechmann, 777 So.2d at 349-50 (finding ineffective assistance of counsel *720 and rejecting counsel's contention that family members were not available where counsel conducted no investigation and presented no evidence of mitigation); see also Ventura v. State, 794 So.2d 553 (Fla. 2001) (finding trial counsel deficient for failing to investigate and present mitigating evidence where family members testified at postconviction evidentiary hearing that they would have testified at penalty phase had they been contacted). Furthermore, unlike the situation in Asay, since counsel did not conduct a reasonable investigation, he was not informed as to the extent of the child abuse suffered, and thus he could not have made an informed strategical decision not to present mitigation witnesses.
In sum, Ragsdale has clearly established that counsel deficiently handled the penalty phase, and when the evidence which was available is measured against the evidence presented at the penalty phase, there is a reasonable probability of a different result. See Rose, 675 So.2d at 572 (counsel ineffective at penalty phase for failing to present evidence of severe mental disturbance and for failing to present evidence of defendant's alcoholism and mistreatment as a child); Hildwin, 654 So.2d at 110 (ineffective assistance where counsel failed to present evidence of defendant's mental mitigation and several categories of nonstatutory mitigation including defendant's abuse and neglect as a child and his history of alcohol abuse); Phillips v. State, 608 So.2d 778, 783 (Fla.1992) (ineffective assistance of penalty-phase counsel where, although counsel presented some evidence in mitigation, he did not present a large amount of evidence concerning defendant's childhood riddled with abuse and testimony of experts describing defendant's mental and emotional deficiencies); Stevens v. State, 552 So.2d 1082, 1087 (Fla.1989) (counsel's failure to investigate defendant's background, failure to present mitigating evidence during the penalty phase, and failure to argue on defendant's behalf rendered his conduct at penalty phase ineffective). This is especially compelling when considered with the relative culpability evidence presented at the penalty phase by counsel for Ragsdale's codefendant, Illig, who pled nolo contendere in exchange for a life sentence.
We recognize that when reviewing ineffective assistance of counsel claims we give deference to the circuit court's superior vantage point and uphold factual findings that are supported by competent, substantial evidence. See Stephens, 748 So.2d at 1034. However, in this instance, while the circuit court ruled against Ragsdale on the deficiency and prejudice prongs of the ineffectiveness claim, the circuit court's summary order contains virtually no factual findings. We have repeatedly stressed the need for trial judges to enter detailed orders in postconviction capital cases. The present order is completely inadequate and does not assist us in our review. Accordingly, we reverse the circuit court's order, vacate Ragsdale's death sentence, and remand for a new penalty phase before a jury.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
QUINCE, J., recused.
NOTES
[1] Ernie Ragsdale (Ragsdale's younger brother), Darlene Parker (Ragsdale's cousin), and Byron Ragsdale (Ragsdale's cousin) testified at the evidentiary hearing. Rebecca Lockhart (Ragsdale's aunt) and Sheila Adams (Ragsdale's cousin) had medical reasons for not testifying at the evidentiary hearing. However, both gave corroborative testimony by way of depositions to perpetuate testimony as to the child abuse suffered by Ragsdale. Ernie lived with Ragsdale throughout his childhood; Darlene and Byron lived next door to Ragsdale for two years; Rebecca would visit the Ragsdale's once a year for about a week; and Sheila lived one year with the Ragsdales when Ragsdale was about thirteen years old.
[2] Ragsdale's parents were deceased at the time of the evidentiary hearing.
[3] Before Ragsdale's trial, predecessor counsel retained psychologist Dr. Delbeato to conduct a psychological examination of Ragsdale's sanity, competence, and general mental health. Dr. Delbeato conducted the examination and reduced his findings to a report. The Delbeato report was in Ragsdale's file at the time that counsel was appointed to the case. In addition, as the trial court ordered the examination, the Delbeato report was a part of the direct appeal record, but it was never admitted into evidence before the jury at the penalty phase.
[4] Counsel's wife had worked with him on past cases, had prior experience as a probation officer, and was later an investigator with the public defender's office.