885 So.2d 338 (2004)
George M. HODGES, Appellant,
v.
STATE of Florida, Appellee.
George M. Hodges, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC01-1718, SC02-949.
Supreme Court of Florida.
October 14, 2004.
Rehearing Denied December 22, 2004.
*343 Michael P. Reiter, Capital Collateral Counsel, and Linda McDermott, Assistant CCC-NR, Office of the Capital Collateral Counsel  Northern Region, Tallahassee, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Candance M. Sabella, Senior Assistant Attorney General, Chief of Capital Appeals, and Kimberly Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
George Michael Hodges seeks review of an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Hodges also petitions this Court for writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9) Fla. Const. For the reasons stated herein, we affirm the circuit court's denial of Hodges' rule 3.850 motion and deny Hodges' habeas petition.

FACTS AND PROCEDURAL HISTORY
On February 22, 1989, George Michael Hodges was indicted by a grand jury and charged with one count of first-degree murder. Hodges pled not guilty, and proceeded to trial. As reflected in Hodges v. State, 595 So.2d 929 (Fla.1992) (Hodges I), the facts pertinent for disposition of the claims presented in Hodges' 3.850 appeal and his habeas petition demonstrate as follows:
In November 1986 Plant City police arrested Hodges for indecent exposure based on the complaint of a twenty-year-old convenience store clerk. Around 6:00 a.m. on January 8, 1987, the day Hodges' indecent exposure charge was scheduled for a criminal diversion program arbitration hearing, the clerk was found lying next to her car in the store's parking lot. She had been shot twice with a rifle and died the following day without regaining consciousness.
Hodges worked on the maintenance crew of a department store located across the road from the convenience store. A co-worker told police that she saw Hodges' truck at the convenience store around 5:40 a.m. on January 8. Hodges, however, claimed to have been home asleep at the time of the murder because he did not have to work that day. His stepson, Jesse Watson, and his wife, Jesse's mother, supported his story. The police took a rifle from the Hodges' residence that turned out not to be the murder weapon. The investigation kept coming back to Hodges, however, and the police arrested him for this murder in February 1989. At trial Watson's girlfriend testified that, during the summer of 1988, she asked Hodges if he had ever shot anyone. She said he responded that he had shot a girl and had given Watson's rifle to the police and had disposed of his. Hodges' wife, contrary to her original statement to the police, testified that she did not know if Hodges had been in bed all night or when he had gotten up, that her son and *344 husband had identical rifles, and that she did not know that Hodges had been arrested for indecent exposure.
As did his mother's, Watson's trial testimony differed from his original statement. He testified that he and Hodges had identical rifles and that his, not Hodges', had been given to the police.... Watson also said that, two months after the murder, he saw the rifle in the back of Hodges' truck, wrapped in dirty plastic, and that there was a hole in the ground near the toolshed....
The jury convicted Hodges as charged, and the penalty proceeding began the following day. At the end of the defense presentation counsel told the court that Hodges had become uncooperative, and Hodges stated on the record that he did not want to testify in his own behalf. After the jury retired to decide its recommendation, it sent a question to the court regarding the instructions. The court had the parties return to discuss the jury's request, but, shortly before that, Hodges had attempted to commit suicide in his holding cell. Defense counsel moved for a continuance and said that he could not waive Hodges' presence. The court, however, held that Hodges had voluntarily absented himself, told the jury that Hodges was absent because of a medical emergency, and reread the instructions on aggravating and mitigating circumstances. When the jury returned with its recommendation of death, Hodges was still absent.
After accepting the jury's recommendation, the court appointed two mental health experts to determine Hodges' competency to be sentenced. These experts' reports cautioned that Hodges might attempt to commit suicide again because of his anger and frustration, but concluded that he was competent to be sentenced. After considering these reports and hearing argument on the appropriate sentence, the court sentenced Hodges to death.
Id. at 930-31. This Court affirmed Hodges' conviction and death sentence. See id. at 935.
Subsequently, Hodges petitioned the U.S. Supreme Court for a writ of certiorari. The Supreme Court granted certiorari and vacated this Court's decision for further consideration in light of the Supreme Court's decision in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). See Hodges v. Florida, 506 U.S. 803, 113 S.Ct. 33, 121 L.Ed.2d 6 (1992). Upon remand, this Court reaffirmed the earlier decision, finding that the sufficiency of the cold, calculated, and premeditated instruction was not preserved for review and that error in the instruction, if any existed, was harmless and would not have affected the jury's recommendation or the judge's sentence. See Hodges v. State, 619 So.2d 272, 273 (Fla.1993) (Hodges II).
On June 23, 1995, Hodges filed his initial rule 3.850 postconviction motion to vacate his conviction and sentence. Hodges subsequently amended this motion, and a Huff[1] hearing was held before Thirteenth Judicial Circuit Court Judge J. Rogers Padgett on January 25, 1999. On June 21, 1999, Judge Padgett recused himself from the case due to the election of Hodges' penalty phase defense counsel, Daniel Perry, to the position of circuit court judge in Judge Padgett's judicial circuit. Judge Dennis Maloney of the Tenth Judicial Circuit was assigned to the case. On October 29, 1999, Judge Padgett signed an order related to the Huff hearing he had previously *345 presided over prior to his recusal, which granted Hodges an evidentiary hearing on certain of his claims. On November 2 and 3, 2000, and January 29, 2001, evidentiary hearings were held on these claims with Judge Maloney presiding.
On June 1, 2001, Judge Maloney entered a written order denying Hodges' motion. In his appeal of this denial, Hodges asserts the following seven issues: penalty phase counsel rendered ineffective assistance by failing to conduct an adequate background investigation; mental health experts rendered incompetent assistance prior to trial; the trial court denied Hodges' due process right to a full and fair hearing and impartial judge; guilt and penalty phase counsel rendered ineffective assistance by failing to present evidence showing that Hodges' mental capacity precluded him from acting in a cold, calculated, and premeditated manner; the jury instructions shifted the burden to Hodges to prove that the death sentence was inappropriate and the sentencing judge employed the same standard; Florida's death penalty statute is unconstitutional as applied because aggravating factors are not charged in the indictment and proven beyond a reasonable doubt by a unanimous jury verdict; and the lower court erred in denying an evidentiary hearing on certain of Hodges' claims.
In his petition for writ of habeas corpus, Hodges repeats his claims regarding the burden shifting and aggravating factors. He also argues that appellate counsel rendered ineffective assistance by failing to challenge on appeal the introduction of collateral crime evidence and the trial court's erroneous exclusion of a potential juror. Hodges also claims that Florida's death penalty statute is unconstitutional because it fails to prevent arbitrary and capricious imposition of the death penalty, violates due process, and constitutes cruel and unusual punishment.

Ineffective Assistance of Counsel  Background Investigation
Hodges argues that his penalty phase counsel was ineffective in failing to conduct a reasonable background investigation that, but for counsel's ineffectiveness, would have unearthed substantial mitigating evidence. Hodges contends that the insufficient background investigation also resulted in inadequate mental health evaluations at trial, thereby depriving him of the benefit of substantial mental mitigating evidence. In advancing this argument, Hodges relies heavily on the fact that one of the experts who evaluated Hodges prior to trial amended his evaluation for the postconviction proceeding, finding substantial mental mitigation.
To prevail on a claim of ineffective assistance of trial counsel, a defendant must demonstrate, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). The first inquiry requires the demonstration of "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The second prong requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. The U.S. Supreme Court has determined that a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Id. To fairly assess counsel's performance, the reviewing court must make every effort to eliminate the "distorting effects of hindsight" and to *346 evaluate the conduct from counsel's perspective at the time. Id. at 689, 104 S.Ct. 2052. The Supreme Court recently reiterated and applied these standards in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
The trial court here determined that penalty phase counsel conducted a reasonable background investigation, and that the deficient results of that investigation were attributable to an uncooperative defendant and unwilling, absent, or recalcitrant witnesses.[2] Ineffective assistance of counsel claims are mixed questions of law and fact, and are thus subject to plenary review based on the Strickland test. See Gaskin v. State, 822 So.2d 1243, 1246-47 (Fla.2002). Under this standard, the Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.; see also Ragsdale v. State, 798 So.2d 713, 715 (Fla.2001). Employing that standard, we affirm the trial court's determination that Hodges' penalty phase counsel conducted a reasonable background investigation, and confirm that Hodges indeed had the benefit of counsel as constitutionally guaranteed. Moreover, even if we assume that counsel performed deficiently, we cannot agree that there is a reasonable probability that, but for such deficiency, Hodges would have received a life sentence.
The mitigating evidence presented during the postconviction proceeding did exceed the quality and quantity of that presented at trial. Trial counsel presented two witnesses in mitigation, Hodges' mother and brother-in-law, who provided testimony regarding Hodges' character and dedication to his family. Postconviction counsel obtained and presented both lay and expert witnesses. During the postconviction proceeding, two of Hodges' siblings and one neighbor provided testimony regarding his impoverished and abusive upbringing. A toxicologist testified that the general area in which Hodges grew up was polluted, and that a river from which Hodges' family reported that Hodges caught and consumed fish contained lead. A sociologist testified that Hodges' hometown constituted a classic example of social disorganization characterized, in part, by a distrust of outsiders.
The opinion testimony of Dr. Michael Scott Maher, a psychiatrist, changed sharply between the time of trial and the postconviction proceeding. Prior to trial, Dr. Maher evaluated Hodges and found that he suffered from depression related to his then-current circumstances, but found no evidence in mitigation. Dr. Maher later changed his testimony to suggest that Hodges suffers from a chronic depressive disorder, and now believes he was likely under the influence of an extreme emotional disturbance at the time of the crime. Dr. Maher now also believes that Hodges has brain damage in the form of frontal lobe impairment, which, combined with his depression, would have prevented him from exhibiting the detached, logical decisionmaking process that characterizes the cold, calculated, and premeditated aggravator.[3] Dr. Maher attributed his change in opinion to the ability to review additional background materials provided by postconviction counsel. Despite this contention, Dr. Maher testified that he rendered an opinion at the time of trial, and did not *347 in any way indicate that he needed or required additional information to reach his conclusions at that time.[4]
The presentation of changed opinions and additional mitigating evidence in the postconviction proceeding does not, however, establish ineffective assistance of counsel. See Asay v. State, 769 So.2d 974, 987 (Fla.2000); Rutherford v. State, 727 So.2d 216, 224 (Fla.1998). The pertinent inquiry remains whether counsel's efforts fell outside the "broad range of reasonably competent performance under prevailing professional standards." See Maxwell, 490 So.2d at 932. Upon review of the trial court's order and record, we conclude that Hodges' penalty phase counsel performed in accordance with such standards. Our analysis of this case turns on the distinction between the after-the-fact analysis of the results of a reasonable investigation, and an investigation that is itself deficient. Only the latter gives rise to a claim of ineffective assistance of counsel.
As stated by the trial court, Hodges' penalty phase counsel was experienced with capital cases, and keenly aware of his responsibility to find and introduce mitigating evidence. During the postconviction proceeding, counsel testified that he would have introduced any available evidence that would have illuminated mitigating factors from Hodges' background or possible mental health issues. While not conclusive, counsel's experience in trying capital cases and appreciation of the necessity to enter mitigating evidence into the record distinguishes this case from others in which counsel rendered constitutionally ineffective assistance. See Ragsdale, 798 So.2d at 718; Rose v. State, 675 So.2d 567, 572 (Fla.1996).
More importantly, the record in the instant case shows that penalty phase counsel conducted a comprehensive investigation in an attempt to uncover mitigating evidence. The record in this case directly contravenes the assertion propounded in the dissenting opinion that Hodges' trial counsel flatly "failed to investigate Hodges' medical or psychological history, failed to investigate Hodges' educational history, and failed to investigate Hodges' military history." Dissenting op. at 362. Counsel engaged an investigator who made inquiries of more than one dozen potential witnesses, including both of Hodges' sisters, his parents, Hodges' best friend, and former employers. While counsel did not contact Hodges' brother, who would have been less than a good witness having been released from prison just shortly before Hodges' trial, record evidence shows that Hodges' sister, Karen Sue Tucker, was indeed contacted. Penalty phase counsel testified that Hodges' family members were not at all cooperative with the defense, that his best friend refused to become involved in the matter or to provide any information, and that his former employers could not even remember him.
The sufficiency of the investigational activity is validated by evidence demonstrating that Hodges' sister, Karen Sue Tucker, was contacted and imposed impossible parameters of availability that effectively removed her from the list of witnesses available to testify, and that Hodges' other sister simply failed to appear at trial despite assurances that she would attend. Hodges' mother did indeed testify during the penalty phase, but did not come forward at that time with any information concerning his upbringing that provided substantial mitigation. The record also shows, as highlighted by the trial court, *348 that Hodges himself became uncooperative with counsel during the penalty phase, refusing to testify on his own behalf.[5] The scope and nature of counsel's investigative effort and family contact distinguish this case from those in which this Court has made a determination of ineffective assistance of counsel. See, e.g., Ventura v. State, 794 So.2d 553, 570 (Fla.2001) (deeming background investigation deficient where defendant served as counsel's sole source for mitigating evidence); Stevens v. State, 552 So.2d 1082, 1086 n. 7 (Fla.1989) (deeming assistance ineffective where counsel, among other failures, made no attempt to contact potential witnesses to obtain mitigating evidence).
In addition to contacting numerous lay witnesses, penalty phase counsel engaged the assistance of two mental health professionals. Dr. Maher testified that at the time of trial, counsel asked him to evaluate Hodges' competency to proceed, and his state of mind at the time of the offense, and to provide any and all other information that might be relevant to his medical or psychiatric condition and mitigation issues. Given that mandate, Dr. Maher, who testified that he is familiar with what constitutes mitigating evidence under Florida law, found absolutely none to present at that time. A second mental health professional also failed to find any helpful mitigating evidence and, in fact, recommended that his name not even appear on the witness list because his findings may have been more useful to the State than the defense. Trial counsel testified that he made a strategic decision not to present the experts' findings to the jury. In light of evidence demonstrating that counsel pursued mental health mitigation and received unusable or unfavorable reports, the decision not to present the experts' findings does not constitute ineffective assistance of counsel. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000); see also Asay, 769 So.2d at 986 (no ineffective assistance of counsel in deciding against pursuing additional mental health mitigation after receiving an unfavorable diagnosis); State v. Sireci, 502 So.2d 1221, 1223 (Fla.1987) (not ineffective assistance of counsel to rely on psychiatric evaluations that may have been less than complete).
While the record does show that counsel did not obtain all of Hodges' background materials until after the mental health experts had made their reports, there is absolutely no indication in any of the school, military, or medical records referenced by postconviction counsel that Hodges had been diagnosed with, or even suspected of suffering from, the existence of brain damage or mental health problems.[6] *349 Contrary to postconviction arguments, Hodges' military records show that he was discharged due to a "defective attitude," his inability to adjust to a disciplined environment, and repeated training infractions. Additionally, with regard to the abstract environmental and sociological reports and testimony offered during postconviction, there is no nexus between the testimony regarding the general social dysfunction of Hodges' hometown area, or the alleged general area environmental pollution, and a connection with Hodges. The environmental and sociological status of St. Albans, West Virginia in the abstract has never been connected to anything related to Hodges, other than that he lived in the area at one time.
Based on the record in this case, and despite the assertion of new additional postconviction arguments, we conclude that penalty phase counsel conducted a reasonable background investigation. This case is analogous to Asay v. State, in which this Court rejected an ineffective assistance of counsel claim where defense counsel presented mitigating evidence bearing on the defendant's character, but did not discover evidence regarding the defendant's poverty-stricken and abusive childhood. See Asay, 769 So.2d at 987-88. In determining that trial counsel did not provide unconstitutionally ineffective assistance of counsel, this Court highlighted the reasonableness of counsel's efforts coupled with the difficulty counsel encountered in obtaining information from the defendant's mother. See id. at 988. Likewise, counsel's reasonable efforts to conduct a background investigation in the instant case were significantly hampered by the failure of the defendant, his relatives, and his friends to either participate in the process or provide useful information. See Rutherford, 727 So.2d at 222.
Contrary to the conclusion reached in the dissenting opinion, defense counsel's performance in the instant matter is entirely distinguishable from that deemed constitutionally deficient in Wiggins. Based on the facts presented in Wiggins, the High Court determined that trial counsel's decision to end the background investigation after review of the presentence investigation report and records kept by the Baltimore City Department of Social Services (DSS) did not reflect "reasonable professional judgment," and did not comport with the professional standards that prevailed in Maryland in 1989, which called for the preparation of a social history report. See Wiggins, 539 U.S. at 522-23, 533-34, 123 S.Ct. 2527.[7] The Wiggins Court noted that the DSS records revealed that Wiggins' mother was an alcoholic, that he resided in numerous foster homes, had emotional difficulties, was frequently absent from school for long periods, and was left alone with his siblings without food. The Supreme Court concluded that such information should have reasonably led to further investigation. See id. at 534, 123 S.Ct. 2527.
In the same vein, Hodges contends that further research into the St. Albans area of West Virginia would have led trial counsel to discover a wealth of mitigating information, from extreme privation and physical, emotional, and sexual abuse suffered by Hodges, to the effects of pollution and *350 social disorganization of his community. The dissenting opinion wholeheartedly endorses that argument, stating that "despite the fact that trial counsel knew Hodges grew up in one of the poorest and most polluted communities in the nation, counsel failed to visit the area in order to develop a meaningful understanding of Hodges' cultural and environmental influences." Dissenting op. at 361.
While it may be true that counsel did not travel to St. Albans, West Virginia to assess the community conditions, such a decision can hardly be deemed deficient when counsel consulted numerous  and arguably better  resources in an attempt to obtain background information. Counsel made inquiries of more than a dozen potential mitigation witnesses, including Hodges' parents, two sisters, and his best friend  all of whom were intimately familiar with Hodges' family life, childhood experiences, and the conditions in St. Albans. If related in any way to Hodges, each of these persons had the opportunity to know and alert trial counsel to any problems in Hodges' background, but none came forward with helpful information during the investigation and conversations. It was simply not unreasonable for counsel to expect the people who surrounded Hodges throughout his formative years, and who had first-hand knowledge of the family and community in which he had lived, to bring out during interviews whatever mitigating evidence was available. Indeed, without assistance from these valuable resources in supplying the context for Hodges' background, it is unclear what value would have redounded from merely a visit to St. Albans or environmental and social conditions in the abstract. Trial counsel also elicited the help of two mental health experts whose direct interviews with Hodges failed to yield mitigating evidence. This is simply not a case, like Wiggins, in which trial counsel unreasonably narrowed the scope of the background investigation to records and reports which facially indicated the need for further investigation.
Even if we could conclude that penalty phase counsel conducted a deficient background investigation, Hodges' ineffective assistance of counsel claim would still fail because he cannot establish that he was prejudiced by such deficiency. See Maxwell, 490 So.2d at 932. As a threshold matter, Hodges' position overstates the mitigative value of the postconviction testimony regarding the social dysfunction of his community and the environmental toxins in the area where he previously lived. The environmental expert who testified during the postconviction proceeding admitted that she did not even know whether Hodges was actually exposed to the toxins present in the area in which he previously lived, and never even examined him for signs of lead exposure, the alleged river toxin. The sociologist who testified as to the dysfunctional nature of St. Albans could never connect the social commentary to Hodges because he admitted that he had never spoken with Hodges, and conceded that Hodges successfully extricated himself from whatever conditions existed in the town when he moved to Florida, and apparently into functioning normally in a normal Florida environment.
In assessing the prejudice prong of the Strickland standard, the Wiggins Court reweighed the evidence in aggravation against the totality of the mitigating evidence, and determined the evidence of severe privation, physical and sexual abuse and rape, periods of homelessness and diminished mental capacities, comprised the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability." Wiggins, 539 U.S. at 535, 123 S.Ct. 2527. Noting that in Maryland, the death recommendation must be unanimous, *351 the High Court determined, "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that one juror would have struck a different balance." Id. at 537, 123 S.Ct. 2527.
A similar analysis in the instant matter fails to yield a similar result. Certainly, the absence of generalized evidence pertaining to the asserted social dysfunction of Hodges' entire hometown, and his exposure to environmental toxins in the general area, even when coupled with more specific evidence regarding his abusive and impoverished upbringing, would not have rendered the sentencing proceeding unreliable. The jury recommended a death sentence by a ten-to-two majority, and the trial court found that the State had established two serious aggravators: commission of murder to disrupt or hinder law enforcement and that the act was committed in a cold, calculated, and premeditated manner. See Hodges I, 595 So.2d at 934. Even with the postconviction allegations regarding Hodges' upbringing, it is highly unlikely that the admission of that evidence would have led four additional jurors to cast a vote recommending life in prison. See Asay, 769 So.2d at 988 (determining that there was no reasonable probability that evidence of the defendant's abusive childhood and history of substance abuse would have led to a recommendation of life where the State had established three aggravating factors, including CCP); see also Breedlove v. State, 692 So.2d 874, 878 (Fla.1997).
Furthermore, we determine that Hodges was not prejudiced by penalty phase counsel's failure to present mitigating evidence pertaining to Hodges' mental health. The strongest mitigating factor presented during postconviction was that Hodges was likely under the influence of an extreme emotional disturbance at the time of the crime. However, on cross-examination both mental health experts retreated from and softened their conclusions in this regard. In fact, Dr. Maher could not opine with any specificity that Hodges was under the influence of an extreme emotional disturbance at the time of the crime, but came to a "general conclusion" that at that time in his life, Hodges' mental state more likely than not would have satisfied the statutory requirement for mitigation. Additional cross-examination revealed that the test used by Dr. Beaver to evaluate Hodges' symptoms of depression in April of 2000 may not serve as a reliable indicator of Hodges' mental state at the time of the crime. Moreover, their conclusions regarding Hodges' mental state were totally rebutted by the State's expert, who characterized Hodges as suffering from a dysthymic disorder, a form of long-term depression marked by symptoms less profound than major depression. Based on the marginal nature of the evidence, we do not agree with the dissent that, but for trial counsel's failure to present such mental mitigation, there is a reasonable probability, which has been defined as a probability sufficient to undermine our confidence in the outcome, that Hodges would have received a life sentence. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
In addition, neither defense expert could conclude with any precision that Hodges' depression and purported brain dysfunction would preclude him from engaging in a cold, calculated, and premeditated act. As found by the trial court, the fact that Hodges had been convicted of a premeditated murder involving the act of lying in wait for the victim and the concocting of an intricate cover-up would contravene *352 any such conclusion.[8] According to the State's rebuttal expert, other indicators of Hodges' ability to perform a cold, calculated, and premeditated act included his attempt to talk the victim out of prosecuting the indecent exposure charge prior to the murder, the advanced planning required to commit suicide while in jail, and his success in extricating himself from the impoverished area where he grew up. The fact that these mental health professionals provided such tepid and inconclusive diagnoses after reviewing the background materials provided by postconviction counsel undermines the contention that trial counsel's failure to provide like information resulted in deficient mental evaluations at trial. Indeed, as previously discussed, the content of Hodges' school, medical, and military records, as judged by the postconviction conclusions drawn from them, simply does not support the assertion that trial counsel's failure to provide such information to Hodges' evaluators constituted deficiency resulting in prejudice.
This case is distinguishable from Phillips v. State, 608 So.2d 778 (Fla.1992), in which we determined that the defendant was prejudiced by counsel's failure to present "strong mental mitigation" at trial. Id. at 783. In that case, two experts opined in the postconviction proceeding that the defendant was suffering from an extreme emotional disturbance at the time of the crime, was unable to conform his conduct to the requirements of law, and could not form the requisite intent to fall under the aggravating factors of CCP or heinous, atrocious, or cruel. See id. Also important to our analysis of that case was the fact that the mental mitigation was essentially unrebutted and that the jury had recommended the death sentence by the slim majority of seven to five. See id. Based on those factors, we concluded that there was a reasonable probability that "but for counsel's deficient performance ... the vote of one juror would have been different, ... resulting in a recommendation of life." Id. The comparatively weak mental mitigation offered in Hodges' postconviction proceeding coupled with the State's rebuttal of that evidence and the wide margin by which the jury recommended the death penalty distinguish this case from Phillips, and undermine any reasonable probability that presentation of the evidence would have resulted in a life recommendation.

Ineffective Assistance of Mental Health Experts
Hodges argues that penalty phase counsel's failure to ensure that Hodges received the benefit of fully informed mental health experts constituted prejudicially deficient performance and deprived Hodges of his entitlement to expert psychiatric assistance as required under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The United States Supreme *353 Court held in Ake that where an indigent defendant demonstrates to the trial judge that his sanity at the time of the offense will be a significant factor at trial, the state must "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake, 470 U.S. at 83, 105 S.Ct. 1087.
Hodges' Ake claim lacks merit. Hodges does not argue that he was denied access to mental health professionals or that these professionals failed to conduct the appropriate examinations. Indeed, any such claim would run contrary to Dr. Maher's testimony that he conducted a standard psychiatric evaluation of Hodges prior to trial. Hodges had access to multiple mental health experts prior to trial, and the experts performed all of the essential tasks required by Ake. Thus, Hodges fails to establish a violation of the Ake rule. See Johnson v. State, 769 So.2d 990, 1005 (Fla.2000). Instead, Hodges simply recasts his ineffective assistance of counsel argument, which we reject for the reasons stated above.

Violation of Due Process
Hodges next claims that the circuit court violated his due process right to a full and fair hearing and his right to an impartial judge when Judge Maloney engaged in improper ex parte communications with the State. Hodges' claim stems from a series of conversations starting on September 9, 1999, when Judge Maloney's staff attorney contacted Hodges' counsel to discuss the scheduling of a Huff hearing. On September 22, 1999, Hodges' counsel was informed by the assistant state attorney that the court had changed the scheduled Huff hearing to an evidentiary hearing, and requested that the parties draft a proposed order outlining Judge Padgett's rulings from the Huff hearing held eight months prior.
Hodges claims that the discussion between Judge Maloney's staff and the State violated the proscription against ex parte contact because the decision to change the scheduled Huff hearing to an evidentiary hearing bore on the merits of the pending proceeding. As a result, Hodges argues that he was denied the opportunity to be heard as to the status of his case, the scope of the evidentiary hearing, and how an order on the rule 3.850 motion should be prepared. In support of his argument, Hodges invokes our decision in Rose v. State, 601 So.2d 1181 (Fla.1992), in which we held that judicial integrity requires judges to refrain from engaging in any conversations with a single party to a proceeding, except to address strictly administrative matters. See id. at 1183.
Hodges' due process argument is without merit. Judge Padgett presided over a Huff hearing in the instant case on January 25, 1999. At that time, Hodges was given a full and fair opportunity to present his arguments, and at the close of the hearing, Judge Padgett entered conclusions into the record orally, granting Hodges an evidentiary hearing on certain of his claims. In the post-recusal transfer between Judge Padgett and Judge Maloney, Judge Maloney apparently was not informed that a Huff hearing had already taken place. Although it is not entirely clear from the record, this miscommunication concerning the administration of the case was discovered and rectified either before or during the conversation between the judge's staff attorney and the assistant state attorney. Nothing in that conversation could have impacted the merits of Hodges' case because Judge Padgett had already decided which of his claims would proceed to an evidentiary hearing. See Swafford v. State, 636 So.2d 1309, 1311 *354 (Fla.1994) (distinguishing Rose based on the fact that a Huff hearing had been conducted).
Moreover, Hodges was not denied an opportunity to review a substantive order, because Judge Maloney's staff attorney requested both parties to participate in drafting the order outlining Judge Padgett's findings from the Huff hearing. See Diaz v. Dugger, 719 So.2d 865, 867-68 (Fla.1998) (finding no grounds for reversal where the communications occurred between the parties and the judicial assistant and appellant's counsel reviewed the order prior to its submission to the court). The contact here was simply to address a necessary administrative matter.
Hodges further argues that the ex parte communications between Judge Maloney's staff and the State cast substantial doubt on his ability to obtain a fair hearing. As a result, Hodges argues that Judge Maloney abused his discretion in failing to grant Hodges' motion to disqualify. A motion to disqualify will be dismissed as legally insufficient if it "fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing." See Arbelaez v. State, 775 So.2d 909, 916 (Fla.2000). As with his due process claim, Hodges argues that the ex parte communications coupled with the recasting of a Huff hearing to an evidentiary hearing evinces an inability to receive a fair trial. Like the due process argument, Hodges' contention has no merit. As Hodges establishes no other basis for a well-grounded fear that he would not receive a fair trial, see Arbelaez, 775 So.2d at 916, we determine that Judge Maloney did not abuse his discretion in rejecting Hodges' motion to disqualify.
Hodges also argues that his due process rights were violated when the trial court granted the State access to him for the purpose of conducting a mental health evaluation two days before the evidentiary hearing, thereby forcing defense counsel to split limited resources between preparing for the hearing and opposing the motion. As further evidence of a due process violation, Hodges contends that the defense presented its case without knowledge of the evidence or witnesses the State would rely on in rebuttal. As a threshold matter, there is no due process violation in simply granting the State access to the defendant for the purpose of conducting a mental health evaluation. See Dillbeck v. State, 643 So.2d 1027, 1030 (Fla.1994) (holding that fairness dictates providing the State access to a defendant for purposes of conducting a mental health evaluation where the defendant intends to present mental mitigating evidence during the penalty phase). Indeed, the Florida Rules of Criminal Procedure have been amended to allow for such access in the context of a postconviction proceeding. See Fla. R.Crim. P. 3.851(f)(6) (effective October 1, 2001). While the amended rule does not apply to Hodges' 3.850 motion, which was submitted prior to the amendment's effective date, the reasoning undergirding the amendment, and our decision in Dillbeck, essentially refute any argument that a due process violation would result from the grant of access alone.
The evidentiary record also contravenes Hodges' contention that the timing of the State's request for access and the delay between his presentation of mental mitigating evidence and the State's rebuttal violated his due process rights. The record does not show that the State purposefully delayed submission of the motion for access. To the contrary, the State did not receive Hodges' second amended witness list until October 12, 2000, approximately two weeks prior to the evidentiary hearing. Shortly after receiving the amended witness list, the State submitted a motion to *355 depose Hodges' mental health experts, specifically noting that it had not yet received their expert reports or curricula vitae. Only upon deposing the experts in late October did the State have notice regarding the precise nature of Hodges' alleged brain dysfunction. Upon learning the exact nature of the claims, the State submitted its motion for access to conduct a mental health evaluation on October 31, 2000. While neither the timing of the State's evaluation nor the delay between presentation of Hodges' case and the State's case was ideal, these factors do not amount to a due process violation.

Failure to Grant Evidentiary Hearing
Hodges argues that the trial court erred in summarily denying an evidentiary hearing on certain of his claims. This Court has set forth the following standard for determining whether an evidentiary hearing is required for postconviction claims for relief:
Under rule 3.850, a postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief. The movant is entitled to an evidentiary hearing on a claim of ineffective assistance of counsel if he alleges specific "facts which are not conclusively rebutted by the record and demonstrate a deficiency in performance that prejudiced the defendant." Upon review of a trial court's summary denial of postconviction relief without an evidentiary hearing, we must accept all allegations in the motion as true to the extent they are not conclusively rebutted by the record.
Gaskin v. State, 737 So.2d 509, 516 (Fla.1999) (citations and footnote omitted). A defendant is not entitled to an evidentiary hearing if the postconviction motion is legally insufficient on its face. See Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). The record supports the trial court's decision to deny an evidentiary hearing on each of Hodges' following claims.
Hodges contends that he was entitled to an evidentiary hearing on the trial court's provision of an unconstitutional cold, calculated, and premeditated jury instruction. The substance of Hodges' claim is procedurally barred because the Court has previously addressed it and determined that the sufficiency of the cold, calculated and premeditated instruction was not preserved for review. See Hodges II, 619 So.2d at 273. The ineffective assistance of counsel portion of the claim is meritless because this Court also previously determined that error in the instruction, if any existed, was harmless and would not have affected the jury's recommendation or the judge's sentence. See id. Thus, as the trial court determined, Hodges cannot satisfy the prejudice prong of the Strickland test. Therefore, summary denial of this claim was appropriate. See Gaskin, 737 So.2d at 516.
Hodges also claims that comments by the prosecutor and trial court diminished the jury's sense of responsibility for the sentencing process, and merited an evidentiary hearing. This claim is not cognizable on collateral review because Hodges could have but did not raise the argument on appeal. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). Moreover, summary denial of the ineffective assistance of counsel portion of the claim was appropriate because the record refutes any claim of prejudice resulting from the complained-of comments. See Gaskin, 737 So.2d at 516. This Court has consistently determined that similar claims lack merit, see Cook v. State, 792 So.2d 1197, 1201 (Fla.2001), and the record in the instant case does not support any conclusion to the contrary.
*356 Hodges further argues that he was entitled to an evidentiary hearing pertaining to prosecutorial misconduct emanating from the State's penalty phase closing argument. The substantive portion of this claim is procedurally barred as it was raised and rejected on direct appeal. In response to substantially the same argument as Hodges advances in the instant 3.850 appeal, this Court determined that the prosecutorial comments Hodges complained of did not constitute the type of victim impact evidence prohibited by Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), as that rule stands after the U.S. Supreme Court's decision in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). See Hodges I, 595 So.2d at 933. In reviewing Hodges' direct appeal, this Court also considered the prosecutor's comments regarding the inappropriateness of life imprisonment for Hodges, and, reaching the substance of that claim under a harmless error analysis, determined that "on the circumstances of [Hodges'] case we find the argument harmless error." Hodges I, 595 So.2d at 934. Consequently, since no reversible error existed, Hodges is unable to demonstrate the prejudice requisite for a successful ineffective assistance of counsel claim, rendering summary denial of the issue appropriate. See Gaskin, 737 So.2d at 516.
Those in dissent agree with Hodges' contention, concluding that counsel was ineffective for failing to object to the prosecutor's comments regarding life imprisonment  comments counsel should have known were improper by virtue of this Court's decision in Jackson v. State, 522 So.2d 802 (Fla.1988), rendered one year prior to Hodges' trial. See dissenting op. at 367. However, this position fails to acknowledge this Court's prior determination that the commentary upon which the dissent relies constituted harmless error, and the implication of that determination for the prejudice prong of the Strickland standard. See Hodges I, 595 So.2d at 933-34. This Court has previously examined the prosecutor's comments, as set forth in the dissenting opinion, through the prism of our decisions in Jackson, Hudson v. State, 538 So.2d 829 (Fla.1989), and Taylor v. State, 583 So.2d 323 (Fla.1991). In so doing, this Court previously determined that the instant case was more analogous to Hudson, where the defendant had failed to object to similar comments deemed not to constitute reversible error, and Jackson, where the defendant had objected to comments later deemed harmless, than to Taylor, where this Court determined that similar prosecutorial comments, to which defense counsel had objected, were not harmless. See Hodges I, 595 So.2d at 933-34. There is no compelling reason to revisit that conclusion or overrule a determination of this Court entered in this case while before us in prior proceedings.
Moreover, this Court's comparison of Hodges' claim to Jackson  a case in which error was preserved through contemporaneous objection  coupled with the use of the phrase "harmless error," see id., belies the contention that the Court applied a fundamental error analysis to the claim. Our prior decision simply does not support the position that had Hodges' counsel objected to the prosecutor's remarks, this Court would have reversed his conviction.
The dissenting opinion attempts to focus on counsel's purportedly deficient performance for failing to object to the prosecutor's closing argument. However, even a cursory review of the transcript reveals that defense counsel engaged in a strategy intended to sway the jury to return a life recommendation by distinguishing the crime committed by Hodges from more heinous first-degree murders. Trial counsel first debunked the existence of the *357 witness elimination and CCP aggravators, and then reviewed the remaining statutory aggravators, reminding the jury after each that it did not apply in Hodges' case, and, thus, that the death penalty was not warranted.
Finally, Hodges argues that he was entitled to an evidentiary hearing regarding whether the jury instructions employed in his case misled the jury to believe that they could not render a valid sentence if they were tied six votes to six. Again the substantive issue underlying Hodges' claim is procedurally barred because Hodges could have but did not raise the argument on appeal. See Harvey, 656 So.2d at 1256. The ineffective assistance of counsel portion of the claim lacks merit because the judge did indeed advise the jury that if six or more of them recommended life, they would have made a life recommendation. While Hodges concedes that these instructions were proper, he contends that they were rendered nugatory by previous statements giving the jury the erroneous impression that they could not return a valid sentence if the vote was tied. This Court has recently considered and rejected a substantially similar argument. See Floyd v. State, 808 So.2d 175, 185-86 (Fla.2002). Moreover, as the trial court found, any extant error was harmless because the jury returned a death recommendation by a vote of ten to two. Given that the record clearly refutes Hodges' ability to satisfy the prejudice prong of Strickland, summary denial was appropriate.

Habeas Corpus  Collateral Crime Evidence
In his petition for writ of habeas corpus, Hodges argues that it was an abuse of discretion for the trial court to admit evidence revealing that the victim had accused Hodges of indecent exposure, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. To assess whether Hodges is entitled to relief on this issue, this Court must determine whether appellate counsel's failure to raise it on appeal is of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Floyd, 808 So.2d at 183 (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)).
Evidence of other crimes or bad acts committed by the accused is generally admissible if relevant to a material fact in issue, except where such evidence is solely relevant to demonstrate the bad character of the accused, or propensity of the accused to engage in criminal conduct. See Williams v. State, 110 So.2d 654, 663 (Fla.1959). The admissibility of collateral crime evidence is within the discretion of the trial court, and the trial court's ruling shall not be disturbed upon review absent an abuse of that discretion. See LaMarca v. State, 785 So.2d 1209, 1212 (Fla.2001). Under that standard, Hodges cannot sustain a claim for relief on this issue.
The record shows that upon defense counsel's objection to the introduction of testimony revealing the nature of the victim's charge against Hodges, the trial court received argument underscoring the relevance of the evidence to show that prosecution of the charge angered Hodges, who maintained that the incident was an accident. The trial court thus reasonably concluded that revealing the nature of the charge would illuminate a material fact at issue  namely Hodges' attempt to characterize the incident as an accident and why continued prosecution may have motivated *358 him to commit murder. There is no basis to conclude that the trial court abused its discretion in deeming the evidence relevant.
Regardless of relevancy of collateral crime evidence, however, admissibility is improper where the probative value of the evidence is substantially outweighed by undue prejudice. See Bryan v. State, 533 So.2d 744, 746 (Fla.1988). Based on the facts of the case, Hodges cannot establish that the prejudicial impact of the evidence outweighed its probative value. Hodges stipulated to the fact that the woman he stood accused of murdering had filed charges against him and was adamant about prosecution. With that fact already in the minds of the jury, it defies logic to conclude that the scale balancing probative value versus prejudicial impact would have been tipped by revealing the nature of the pending charges. With almost no probability of overcoming the abuse of discretion standard, counsel cannot be faulted for failing to raise the claim on appeal. See Kokal v. Dugger, 718 So.2d 138, 142 (Fla.1998).

Habeas Corpus  Juror Dismissal
Hodges contends that his due process rights were violated when the trial court struck for cause juror Alvarez-Gil based on her views regarding the death penalty. Hodges argues that he was denied a jury that represented a fair cross section of the community, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. This Court has held that a challenge to dismissal of a juror who expresses a general objection to the death penalty is not preserved for review where there is no objection at trial. See Maxwell, 490 So.2d at 930. Hodges and the State disagree regarding whether trial counsel properly preserved the issue regarding the dismissal of Alvarez-Gil.
To preserve an issue for review, counsel must timely raise an objection that is "sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor." § 924.051(1)(b), Fla. Stat. (2002). In Cannady v. State, 620 So.2d 165 (Fla.1993), defense counsel lodged a general objection to the dismissal of four potential jurors based on what the State characterized as the "philosophy that no anti-death penalty jurors should be excused." Id. at 169. Expressly noting that trial counsel had failed to object to the excusal of the jurors individually, this Court determined that the issue of juror dismissal was not preserved for review. See id.
As in Cannady, trial counsel in the instant case did not lodge a specific objection to Alvarez-Gil's dismissal, but did state for the record that she vacillated in her opposition to the death penalty. When the State sought to strike a second potential juror for the same reason, trial counsel stated that the State "is striking every one [sic] who has reservations about the death penalty." Trial counsel further stated, "I think it's going to invalidate our defendant's right to a fair cross-section of the community." After the State successfully struck a third juror for the same reason, trial counsel objected and stated that he had the "[s]ame objection for all of those [the State] struck concerning death penalty."
The record shows that trial counsel made a generalized objection to the dismissal of jurors based on their death penalty views. As in Cannady, the objection was not specific to the challenged dismissal. Thus, under controlling precedent, the objection cannot be given retroactive effect to encompass the removal of Alvarez-Gil. Therefore, we conclude that the issue of *359 Alvarez-Gil's dismissal was not properly preserved for review and cannot serve as a basis for an ineffective assistance of appellate counsel claim.

Remaining Claims
Hodges raises several additional claims in either his 3.850 appeal or petition for writ of habeas corpus.[9] These arguments have consistently been determined to lack merit.[10] Hodges provides no compelling reason for us to reconsider long-established law on these points, and we therefore decline to address these claims at length in this context.

CONCLUSION
For the reasons stated above, we affirm the trial court's decision denying Hodges' motion for postconviction relief and deny his petition for writ of habeas corpus.
It is so ordered.
WELLS, LEWIS, CANTERO and BELL, JJ., concur.
PARIENTE, C.J., dissents with an opinion, in which ANSTEAD, J., concurs.
QUINCE, J., recused.
PARIENTE, C.J., dissenting.
I respectfully dissent, and would grant rehearing based on the United States Supreme Court's decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). This is a particularly troubling death case. The failure to investigate and present mitigation, in conjunction with defense counsel's failure to object to a patently improper penalty-phase closing argument, in my view satisfies the first prong of Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The postconviction proceedings revealed substantial mitigation that was never presented at the original penalty phase which probably would have established that life imprisonment rather than death was the appropriate punishment for Hodges, satisfying the second prong of Strickland. The United States Supreme Court opinion in Wiggins, which was decided seven days after our initial majority opinion, provides even stronger support for Hodges' ineffective assistance of counsel claim.
The defendant, who was thirty years old, married, employed, and had no history of prior violent felonies at the time of the murder, shot and killed the victim.[11] The *360 apparent motive for the murder was that the victim had accused Hodges of exposing himself, after which Hodges was arrested. However, Hodges had apparently been directed into a diversion program and there was no suggestion that this prosecution for a misdemeanor would result in his incarceration.
It is clear in looking at the nature of this crime that mental mitigation could have made a difference if it had been presented. However, the defense case for mitigation was almost nonexistent. The penalty phase of the original trial lasted a total of approximately forty-five minutes, during which time the State put on three witnesses to testify to hearsay statements by the victim that Hodges had approached her in an attempt to convince her to drop the exposure charge. The defense called only two witnesses: Hodges' mother and brother-in-law. Their transcribed testimony totals less than six pages. No mental health testimony was introduced. I have appended to this dissent the sum total of the transcribed penalty-phase testimony presented by the defense.
The deficiencies in counsel's performance during the penalty phase consisted not only of what he failed to present to the jury in mitigation but also of other significant omissions. For example, defense counsel's conduct during closing argument provides additional support for a finding of deficient performance. First, defense counsel failed to object to the prosecutor's clearly improper closing argument  an argument which, if objected to, would have resulted in a reversal and a new sentencing proceeding.[12] Second, in his closing argument defense counsel's only argument in mitigation was that Hodges' mother loved her son and the jury should be compassionate.
Even with the scant mitigation presented, the improper closing argument by the prosecutor, and the minimal advocacy in the defense closing argument, the jury recommendation of death was not unanimous (ten-to-two). We now know that mental health experts, when provided with proper background materials and with neuropsychological test results, diagnosed Hodges with chronic depressive disorder and brain damage or dysfunction, which in combination led to Hodges being under the influence of extreme emotional distress at the time of the crime. Thus, the experts' testimony would have allowed the jury, the trial court, and this Court to consider the statutory mitigator of extreme emotional disturbance.
In my view, Hodges has demonstrated that trial counsel was deficient in failing to conduct an adequate background investigation and in failing to present substantial mitigating evidence. In addition, Hodges has demonstrated his counsel's deficiency for failing to object to clearly improper statements in the prosecutor's closing argument of the type that this Court had specifically condemned in a written opinion one year prior to Hodges' penalty phase. These deficiencies deprived Hodges of a reliable penalty-phase proceeding and undermined confidence in the death sentence. Thus, there was ineffective assistance of penalty-phase counsel under the standard set forth in and reaffirmed in the recent decision in Wiggins, entitling Hodges to the benefit of a new penalty phase to determine if death is the appropriate sentence in this case.

*361 INEFFECTIVE ASSISTANCE OF COUNSEL IN PENALTY PHASE
I first address why I conclude that Hodges has demonstrated deficient performance by counsel in failing to conduct an adequate background investigation and present substantial mitigating evidence. As noted above, the facts of the case reveal that Hodges' primary motive for murdering the victim, a woman he barely knew, was to eliminate the possibility that she would testify against him on a misdemeanor indecent exposure charge. Hodges' disproportionate reaction to the threat of testimony should have been explained to the jury, particularly considering that Hodges had little prior criminal history.
However, defense counsel presented only two witnesses in mitigation  Hodges' mother and brother-in-law  who provided minimal testimony regarding Hodges' relationship with his family. Based on these two witnesses' testimony, the only mitigating circumstance found by the trial judge concerned Hodges' character and dedication to his family. See Hodges v. State, 595 So.2d 929, 934 (Fla.1992).[13] None of Hodges' three siblings testified during the penalty phase.
This absence of meaningful mitigation stems from trial counsel's failure to investigate Hodges' school records, military records, and social and psychological history. The mental health experts retained by trial counsel to evaluate Hodges were unable to assist in mitigation primarily because defense counsel did not provide them with this critical information. Indeed, it is undisputed that trial counsel did not give the experts the names of Hodges' schools, hospitals, and treatment centers. The only information trial counsel provided to the experts in this case consisted of the Plant City Police Department records and reports, including the autopsy reports and investigative reports. Moreover, despite the fact that trial counsel knew Hodges grew up in one of the poorest and most polluted communities in the nation, counsel failed to visit the area in order to develop a meaningful understanding of Hodges' cultural and environmental influences.[14] As revealed in the postconviction proceedings, a competent background investigation would have led to compelling mitigating evidence and placed that evidence in a context giving it greater mitigating force.
We have stated that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated  this is an integral part of a capital case." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). In Wiggins, the United States Supreme Court readdressed the standard for assessing whether counsel is ineffective for failing to present mitigation evidence in death cases. The Court stated that
[the] principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]," is not whether counsel should have presented a mitigation case. Rather, [the] focus [is] on *362 whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. In assessing counsel's investigation, [the Court] must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time," [Strickland], at 689, 104 S.Ct. 2052 ("[E]very effort [must] be made to eliminate the distorting effects of hindsight").
539 U.S. at 522-23, 123 S.Ct. 2527 (some citations omitted). Relying on the American Bar Association guidelines, the Court in Wiggins noted that efforts should be made to discover available mitigating evidence and evidence to rebut any aggravating evidence, from such sources as "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Id. at 524, 123 S.Ct. 2527. (emphasis omitted)
This case is substantially similar to Wiggins. Hodges' trial counsel failed to investigate Hodges' medical or psychological history, failed to investigate Hodges' educational history, and failed to investigate Hodges' military history. Defense counsel presented no mental health testimony in mitigation of a sentence on a seemingly irrational crime committed by a person with no significant criminal history. The only means to develop a credible explanation for Hodges' actions would have been through a thorough mental health evaluation. As the Supreme Court recognized in Wiggins,"any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in [the defendant's] background." Id. at 525, 123 S.Ct. 2527.
Indeed, at the evidentiary hearing on this issue, Hodges' own trial counsel failed to advance any justification for a penalty-phase strategy that involved little meaningful investigation. The State's own expert conceded the inappropriateness of counsel's conduct. Even the majority acknowledges that "[t]he mitigating evidence presented during the postconviction proceeding ... exceed[ed] the quality and quantity of that presented at trial." Majority op. at 346. In light of the almost nonexistent mitigation presented at trial and the lack of any credible reason for this failure, that characterization is an understatement. Pursuant to Wiggins, the decision by trial counsel at the time of Hodges' trial not to present mitigating evidence could not have been reasonable because the investigation on which this decision rested fell far below prevailing professional norms.
The majority states that its denial of relief on this issue is controlled by the "distinction between the after-the-fact analysis of the results of a reasonable investigation, and an investigation that is itself deficient." Majority op. at 347. Although I acknowledge that a review of counsel's actual investigation is the proper analysis to be employed when determining whether counsel was deficient, such a review cannot exist in a vacuum. The validity of a comparison between the results yielded by the initial investigation and the investigation in the postconviction phase is demonstrated by the United States Supreme Court's analysis in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In determining that trial counsel was ineffective in that case, the Court specifically noted that had counsel *363 sought certain records, the jury would have learned of Williams' nightmarish childhood, borderline retardation, and nonviolent nature, all of which were discovered in the postconviction investigation. See id. at 395-96, 120 S.Ct. 1495. Therefore, any meaningful analysis must necessarily include the disparity between what counsel uncovered during the original investigation and what postconviction counsel presented in the rule 3.850 motion or hearing. See id.; Rose v. State, 675 So.2d 567, 574 (Fla.1996) ("In light of the substantial mitigating evidence identified at the hearing below as compared to the sparseness of the evidence actually presented, we find that counsel's errors deprived Rose of a reliable penalty phase proceeding.").
In this case, postconviction counsel presented testimony of both lay and expert witnesses, who testified that (1) Hodges' upbringing was severely impoverished;[15] (2) Hodges was physically, mentally, and possibly sexually abused; (3) Hodges grew up in a hometown characterized by social disorganization and a distrust of outsiders; (4) the area where Hodges lived was a "cesspool" filled with hazardous waste and toxic substances that have been shown to lead to neurological deficits and behavioral and nervous system problems in children; (5) Hodges had a dull intellect and a history of closed head injuries; and (6) Hodges had made previous suicide attempts. Moreover, the psychiatrist who evaluated Hodges at the time of trial, Dr. Maher, drastically changed his opinion of Hodges' mental state during the postconviction stage. During the postconviction hearing, Dr. Maher testified that Hodges was likely under the influence of extreme emotional disturbance at the time of trial, and suffered from depression and brain damage. This evaluation of Hodges was corroborated by Dr. Craig Beaver, a forensic psychologist who also testified at the evidentiary hearing.
What is critical is not that Dr. Maher's opinion changed but why it changed. Dr. Maher's changed opinion was caused, in large part, by the evaluation of records trial counsel failed to provide prior to the original penalty phase, including the academic, military, and mental health records contained in the postconviction record. Many of these records contained "red flags" cumulatively indicative of mental health dysfunction, including poor academic history, "poor" home life, speech deficit, IQ testing, and military discharge. Indeed, the military records indicate that Hodges was discharged after only fifty-five days by "reason of unsuitability"/"defective attitude." Internal military documents describe Hodges as "unable to adjust to a disciplined environment." Hodges was also described as a "mentally dull recruit." Although the majority concludes that these records contain no suggestion of brain damage or mental health problems, Drs. Maher and Beaver considered the records highly relevant evidence of mental mitigation. Even the State's own expert, Dr. Merin, testified that it was inappropriate for Hodges' defense counsel to fail to present this mental health information.
*364 Hodges' claim of deficient performance is supported not only by the United States Supreme Court decisions in Wiggins and Williams, but also by this Court's precedent. This case is like Rose and Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001), where we found trial counsel ineffective for failing to present mitigating evidence. In Rose, we determined that trial counsel's failure to "investigate Rose's background and obtain the school, hospital, prison, and other records and materials that contained ... information ... as to Rose's extensive mental problems" deprived Rose of a reliable penalty phase. 675 So.2d at 572. In Ragsdale, we noted that counsel presented only one witness in mitigation, who provided minimal evidence, compared to the "abundance" of mitigating evidence available at the time of trial and presented during the evidentiary hearing. See 798 So.2d at 716. As in Rose and Ragsdale, Hodges' counsel in this case did not secure many critical records and did not provide the mental health expert with complete information, the result of which was a penalty phase in which only two witnesses testified to minimal mitigation.[16]
The cases that the majority relies on, Asay v. State, 769 So.2d 974, 986 (Fla.2000), and Rutherford v. State, 727 So.2d 216, 221 (Fla.1998), are distinguishable. In both Asay and Rutherford, postconviction counsel presented more favorable mental health testimony than that presented at trial. We said in Asay that "the first evaluation is not rendered less than competent simply because appellant has been able to provide testimony to conflict with the first evaluation." 769 So.2d at 986. However, in contrast to this case, in both Asay and Rutherford the postconviction mental health testimony was not based on substantial new information that trial counsel failed to investigate and produce. Indeed, in Asay we specifically noted that "the notes attached to the [first] report indicate that [the trial expert] was aware of most of the facts now advanced by collateral counsel." Id.; see also Rutherford, 727 So.2d at 222 (noting that the trial mental health evaluators were aware of Rutherford's alcoholism and anxiety disorder and merely reached a different conclusion that was not necessarily "inconsistent" with the postconviction evaluation).
In this case, we are not presented with a situation in which postconviction counsel has simply secured a more favorable diagnosis based on substantially the same information available at the time of trial. Rather, Hodges' trial expert has changed his opinion based on new information that trial counsel failed to provide and should have provided if he had conducted an adequate investigation.
Finally, to the extent that the majority concludes that this case is like Rutherford because "counsel's reasonable efforts to conduct a background investigation in the instant case were significantly hampered by the failure of the defendant... to either participate in the process or provide useful information," majority op. at 349, I find this statement to be a mischaracterization of Hodges' behavior. After the presentation of the two defense penalty-phase witnesses, counsel informed the court that Hodges was upset with him, and *365 "doesn't want us to put the second phase on." Counsel did not state that anything Hodges said or did caused him to refrain from presenting additional penalty-phase evidence or that Hodges had in any way impeded counsel's penalty-phase investigation. During the postconviction hearing, Hodges' trial counsel testified that Hodges was "quiet," "unassuming," "cooperative," and "would always answer questions appropriately." Further, the penalty-phase transcript shows that Hodges exercised his right not to testify after he consulted with counsel. The exercise of this right, which is personal to the defendant, should not be interpreted as a lack of cooperation. Furthermore, Dr. Maher specifically testified that Hodges was "absolutely" trying to assist in the 1989 evaluation. According to both Dr. Maher and Dr. Beaver, any perceived inadequacies in Hodges' participation were directly caused by his impairments. As Dr. Maher stated:
His limited IQ, his frontal lobe impairment, his chronic depression, his personality development, that makes him an individual who is in the face of authority passive, compliant, non-complaining, not interested or inclined to air the family's dirty laundry. So, ... because of the very same problems that I have identified here, Mr. Hodges' cooperation in the interviews did not allow me to see sufficiently clearly a need for further intensive investigation.
Hodges' case highlights the importance of counsel's obligation to conduct a thorough background investigation in order to ensure that mental health evaluations are accurate and that mentally impaired defendants such as Hodges are not penalized for their inability to assist themselves.[17]
We have said that "the failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rutherford, 727 So.2d at 221 (quoting Rose, 675 So.2d at 571). However, as noted by the majority, Hodges' trial counsel had very little personal recollection of the trial and the public defender's office lost portions of the trial file, including trial counsel's notes. Thus, our evaluation of whether counsel's performance was deficient is necessarily hindered by the loss of information that would explain counsel's reasons for not investigating and presenting the information revealed during the postconviction proceeding. In my view, Hodges should not be penalized by trial counsel's current inability to justify his trial tactics.
The next prong of an ineffective assistance of counsel claim is prejudice. The test is whether our confidence in the imposition of the death penalty is undermined. The substantial additional mitigation that was uncovered and produced during postconviction investigation, including the mental health mitigating testimony of Dr. Maher and Dr. Beaver, should not be undervalued in this case. Particularly compelling is the fact that had Dr. Maher had access to the information revealed during postconviction proceedings, he would have provided mental health mitigation that could have helped to establish at least one additional statutory mitigator[18] and undermined *366 the establishment of one aggravator, CCP. Without the CCP aggravator, Hodges' death sentence would have been supported by only one aggravator  witness elimination. As Justice Barkett stated in her 1992 opinion dissenting from affirmance of the death sentence after concluding then that Hodges' death sentence was properly supported by only one aggravator:[19]
Against this [single aggravator], Hodges has grown to adulthood with no significant prior criminal history. Despite the fact that there was very little mitigation presented, the trial judge found that Hodges was a contributing member of society, a good employee, and a good and caring husband and father to his four children.
Hodges, 595 So.2d at 935 (Barkett, J., concurring in part, dissenting in part) (footnote omitted) (emphasis supplied). Furthermore, despite the fact that there was very little mitigation presented, Hodges' original death recommendation was not unanimous. I conclude that the change in the balance of aggravation and mitigation flowing from competent penalty-phase representation could well have turned four or more jurors away from a death recommendation.
We now know that there was substantial mitigation never considered by either judge or jury. In light of the nature of the aggravation, the substantial additional mitigation that should have been presented, and the lack of a unanimous recommendation, Hodges has demonstrated both deficient performance and prejudice and is entitled to a new penalty phase because his counsel was ineffective pursuant to Wiggins, Williams, and Strickland.

FAILURE TO OBJECT TO IMPROPER CLOSING ARGUMENT
I next address Hodges' argument that the trial court erred in denying him an evidentiary hearing on his claim that trial counsel was ineffective in failing to object to the prosecutor's closing argument. The majority concludes that the trial court did not err in summarily denying this claim as procedurally barred because it was raised and rejected on direct appeal. See majority op. at 356. This claim is not procedurally barred. As we recently stated in Bruno v. State, 807 So.2d 55 (Fla.2001), in concluding that the trial court erred in summarily denying a similar claim as procedurally barred:
Whereas the main question on direct appeal is whether the trial court erred, the main question in a Strickland claim is whether trial counsel was ineffective. Both claims may arise from the same underlying facts, but the claims themselves are distinct and  of necessity  have different remedies: A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion, and a claim of ineffectiveness generally can be raised in a rule 3.850 motion but not on direct appeal. A defendant thus has little choice: As a rule, he or she can only raise an ineffectiveness claim via a rule 3.850 motion, even if the same underlying facts also supported, or could have supported, a claim of error on direct appeal. Thus, the *367 trial court erred in concluding that Bruno's claim was procedurally barred.
Id. at 63 (footnotes omitted) (second and third emphasis supplied). As in Bruno, the trial court in this case erred in summarily denying Hodges' ineffective assistance of counsel claim as procedurally barred.
On the merits, in my view Hodges has demonstrated that trial counsel's failure to object was deficient and could not be deemed a reasonable strategic decision because the argument was clearly improper and, if objected to, would have constituted reversible error. As part of the State's closing argument at Hodges' 1989 penalty phase, the prosecutor made the following statements without objection:
What about life imprisonment? What can a person do in jail for life? You can cry. You can read. You can watch T.V. You can listen to the radio. You can talk to people. In short, you are alive. People want to live. You are living. All right? If [the victim] had had a choice between spending life in prison or lying on that pavement in her own blood, what choice would [she] have made? But, you see, [she] didn't have that choice. Now why? Because George Michael Hodges decided for himself, for himself, that [she] should die.
Hodges v. State, 595 So.2d at 933 n. *. Because Hodges' trial counsel did not object, appellate counsel was forced to argue that these comments were fundamental error that constituted improper victim impact evidence in violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). See Hodges, 595 So.2d at 933. This Court rejected Hodges' claim of fundamental error. See id. However, we noted that in "attempting to persuade the jury that life imprisonment would not be appropriate, Hodges' prosecutor made the same argument made in several other capital cases," which this Court previously had found to be improper. Id.
In Taylor v. State, 583 So.2d 323, 329 (Fla.1991), this Court specifically addressed this same argument where the prosecutor argued:
But what about life in jail? What can one do in jail? You can laugh, you can cry, you can eat, you can read, you can watch tv, you can participate in sports, you can make friends. In short, you live to find out about the wonders of the future. In short it is living. People want to live. If [the victim] had the choice of life in prison [or death] ... what choice would [the victim] have made? People want to live. [The victim] didn't have that choice because ... Taylor ... decided for himself that [the victim] should die. And for making that decision he too deserves to die.
Aware that the prosecutor had previously made similar arguments, Taylor's defense counsel objected prior to closing. See id. Relying on this Court's decision in Hudson v. State, 538 So.2d 829 (Fla.1989),[20] the prosecutor convinced the trial judge that the argument was proper. See id. at 330. This Court disagreed, specifically noting that not only was the prosecutor's reliance on Hudson incorrect in that this Court had not approved the argument in that case, but also that Jackson v. State, 522 So.2d 802, 809 (Fla.1988), a decision issued one year before Taylor's 1989 trial, clearly prohibited the argument. See Taylor, 583 So.2d at 329.[21] Moreover, this Court stated *368 in Taylor that "any doubt that the prosecutor should have known of Jackson [was] belied by the fact that the Jackson case was tried by his own state attorney's office" in Hillsborough County. Taylor, 583 So.2d at 330. This Court concluded that the error was not harmless and reversed Taylor's death sentence. See id.
The prosecutor's argument in Hodges is substantially similar to the argument in Taylor. Moreover, both Hodges and Taylor were tried in 1989, one year after this Court issued the Jackson opinion. Finally, like Taylor and Jackson, the Hodges case was tried in Hillsborough County. Similar to the prosecutor in Taylor, who we stated should have known that the Jackson opinion clearly prohibited the closing argument, Hodges' defense counsel also should have known that the prosecutor's closing argument was improper.
Finally, in my view the majority's reliance on this Court's previous rejection of this claim of error on direct appeal to support the denial of relief on the ineffectiveness claim is now misplaced. The majority fails to distinguish between Hodges' current claim of ineffectiveness for failing to object at trial and his claim on direct appeal based on the substantive error. By concluding that Hodges is not prejudiced because we denied relief on the substantive claim on direct appeal, the majority ignores the fact that we denied relief primarily because Hodges' counsel failed to object. Indeed, it was the failure to object to the improper closing argument, and thus preserve the issue, that prompted this Court to analogize Hodges to Jackson and Hudson, and analyze the claim for fundamental error.
I further disagree with the majority's conclusion that relief is foreclosed because the Court previously found the error "harmless." See majority op. at 356. Notwithstanding the fact that this Court used the term "harmless" to describe the impact of the error, the fact remains that Hodges did not object at trial. Thus, the issue was not preserved for appeal and this Court could not have performed a conventional harmless error analysis in which the heavy burden would have been on the State to prove beyond a reasonable doubt that the closing argument error did not contribute to the verdict. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). The absence of an objection results in a fundamental error approach, which imposes a heavy burden on the defendant to establish that the error undermined the fairness of the judicial process. See Maddox v. State, 760 So.2d 89, 94 (Fla.2000).
The Court's analysis of the issue on direct appeal clearly shows that its primary focus was on the failure to timely object and thereby preserve what would otherwise have been harmful error.
A further word about the prosecutor's argument is needed, however. In attempting to persuade the jury that life imprisonment would not be appropriate, Hodges' prosecutor made the same argument made in several other capital cases. E.g., Taylor v. State, 583 So.2d 323 (Fla.1991); Hudson v. State, 538 So.2d 829 (Fla.), cert. denied, 493 U.S. 875, 110 S.Ct. 212, 107 L.Ed.2d 165 (1989); Jackson v. State, 522 So.2d 802 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988). In Hudson we summarily dismissed the issue because Hudson had not objected and the argument did not constitute reversible error in that case. In both *369 Jackson and Taylor we held that the instant argument was improper and, because on the circumstances of Taylor the argument was not harmless error and had been objected to, vacated Taylor's sentence and ordered resentencing. In Jackson, on the other hand, we found the argument harmless. The instant case is closer to Hudson and Jackson than to Taylor. Hodges did not object to the prosecutor's argument and on the circumstances of his case we find the argument harmless error.

Hodges, 595 So.2d at 933-34 (footnote omitted) (emphasis supplied).
Had counsel objected to the improper argument, this case would have been just like Taylor, where we stated:
[Hudson] ... stands only for the fact that the prosecutor's argument, under the circumstances of that case, did not constitute reversible error. [N. 5]. Second, the Jackson opinion, which was issued a year before this trial, clearly prohibits this type of argument.... Finally, any doubt that the prosecutor should have known of Jackson is belied by the fact that the Jackson case was tried by his own state attorney's office.... [W]e believe that the circumstances of this case compel us to require a resentencing proceeding.
[N. 5] It should be noted that no objection to the argument was interposed in Hudson.

583 So.2d at 323. As noted above, each of the reasons we gave to justify ordering a resentencing in Taylor is equally applicable in this case.
Moreover, in Taylor the jury recommended death by a unanimous vote and there were no mitigating circumstances and three aggravating circumstances, including the fact that the murder for which Taylor was convicted was especially heinous, atrocious, or cruel. See 583 So.2d at 325. Thus, it seems likely that had counsel objected to the improper argument in this case, we would have applied Taylor and found the error harmful, since Hodges' death recommendation was not unanimous and the trial judge found less aggravation and more mitigation to support the death sentence than in Taylor. In my view, trial counsel's failure to object to an error that, if preserved, would likely have resulted in reversal is exactly the type of conduct that an ineffective assistance of counsel claim is designed to address.[22]
As has been stated by our district courts of appeal, "defense counsel has a duty to object to improper comments by the State and to move for mistrial where required." Eure v. State, 764 So.2d 798, 801 (Fla. 2d DCA 2000) (reversing a conviction based on ineffective assistance of counsel where counsel failed to object to clearly improper closing arguments); see also Gordon v. State, 469 So.2d 795, 796-98 (Fla. 4th DCA 1985) (reversing a conviction based on ineffectiveness where counsel failed to object to numerous improper comments of prosecutor). In my view, defense counsel's failure to stay apprised of pertinent death penalty decisions that would have indicated *370 that this argument was clearly improper and to timely object to a clearly impermissible closing argument falls outside the "broad range of reasonably competent performance under prevailing professional standards." Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986); see also State v. Riechmann, 777 So.2d 342, 350 (Fla.2000).

CONCLUSION
In sum, the United States Supreme Court decisions in Wiggins and Williams, as well as this Court's own precedent, clearly demonstrate that counsel's failure to investigate and present mitigating evidence constituted deficient performance. When these deficiencies are combined with the failure to object to a clearly improper closing argument that probably would have resulted in a reversal of the death penalty, I conclude that Hodges has established both deficient performance and prejudice, satisfying the test for ineffective assistance of counsel under Strickland. Thus, confidence in the imposition of the death penalty is undermined and Hodges is entitled to a new penalty phase.
ANSTEAD, J., concurs.

ATTACHMENT

Complete Transcript of Testimony Presented by Defense in Penalty Phase
MR. PERRY [defense lawyer]: Lula Hodges, Your Honor.
THE BAILIFF: Please step forward before the clerk and be sworn, ma'am. Please be seated on the witness stand, ma'am.
THE COURT: As you testify, ma'am, please speak up in a clear, loud voice so we can all hear you.
LULA HODGES, being sworn, was examined and testified as follows:
DIRECT EXAMINATION BY MR. PERRY:
Q. Would you state your name, please, ma'am?
A. Lula Hodges.
Q. Mrs. Hodges, where do you live?
A. 4905 Denver Street, Dayton, Ohio.
Q. Did George Hodges live, grow up in Dayton, Ohio?
A. No, he didn't.
Q. Where?
A. West Virginia.
Q. Is that where you and will your husband are originally from?
A. Yes.
Q. Do you have any other children besides George?
A. Yes, I have four others besides him.
Q. Are all of those children living?
A. No. Three of them is living. I have one dead.
Q. What year was George born?
A. In '57.
Q. 1957? Was he your youngest, your oldest?
A. He was the youngest.
Q. Your son that is deceased, how did he die?
A. He drowned.
Q. Were he and George close?
A. Yes, they were.
Q. Did his death have any affect on George?
A. Yes, it did.
Q. What affect did his death have on George?
A. It just seemed to change him completely, because they was real close.
*371 Q. You indicate now that you live in Ohio. George grew up in West Virginia during the time he was growing up. Did you move around a lot?
A. Yes, we did.
Q. Was George able to establish any long term friendships?
A. No, he wasn't.
Q. Were most of his activity, most of his friendships more or less limited to the family unit, to his brothers?
A. Yes.
Q. Have you had occasion to see George with his children and stepchildren, I believe, Jessie Watson?
A. Yes. Yes.
Q. Star, and I can't remember his youngest daughter's name.
A. Jennifer.
Q. Jennifer?
A. Yes.
Q. How is George with his children?
A. He was, they loved him. He was good with them.
Q. Did George ever finish high school?
A. No, he didn't.
Q. You know why he quit?
A. Well, we had moved to another job in another state and he was living
with his sister. And he decided wanted to go with us, instead of finishing school.
Q. And did he ever finish school?
A. He got a GED test, yes.
Q. Has George ever been married before?
A. Yes, he has.
Q. When was that?
A. I think it was either '77 or '78. I am not sure.
Q. Does he have a child from that?
A. Yes, he does.
Q. Did you have have occasion to see George interact with that child?
A. Yes.
Q. What was his relationship with that child?
A. They were good.
Q. How would you describe your relationship with George?
A. I  good. We have, we were close.
MR. PERRY: I have no further questions, Your Honor.
THE COURT: Cross?
MR. BENITO: I have no questions of Ms. Hodges.
THE COURT: You may step down, ma'am. Thank you much. Call your next witness.
[The witness leaves the courtroom.]
MR. PERRY: The State would call, I mean the defense would call Harold Stewart. Excuse me, Judge.
THE BAILIFF: Please step forward to the clerk and be sworn, sir. Please be seated here on the witness stand, sir.
THE COURT: As you testify, sir, please speak up a clear, loud voice so we can all hear you.
HAROLD STEWART,
being sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. PERRY:
Q. State your name, please, sir.
A. Harold Stewart.
Q. Mr. Stewart, where do you live?
A. 4107 Street Mulberry.
*372 Q. Where are you employed, Mr. Stewart?
A. Local 1240.
Q. Okay. And what do you do there?
A. I am a laborer.
Q. Okay. Do you know George Hodges?
A. Yes, sir.
Q. Is George Hodges your brother-in-law?
A. Yes, sir.
Q. And his wife is your sister; is that correct?
A. Right.
Q. Do you work with George?
A. Yes.
Q. Or did you work with George?
A. Yes.
Q. What type of worker was George?
A. A good worker.
Q. Did you ever have any problems with him on the job?
A. No.
Q. And did you have occasion to be with George besides at work, on social occasions with he and their children?
A. Yes. He got along with them fine.
Q. What was his relationship with his children, with his stepchildren and his children?
A. He loved them.
Q. Would you say he was a good father?
A. Yes.
Q. How did George get along with your mother, with his in-laws?
A. Got along just fine. They always liked him. They called him if they needed any help in any way, he would come over and help them in any way he could.
Q. Did George have any hobbies that you participated in with him?
A. Well, mostly, fishing. He loved to fish.
Q. Did you go fishing with him often?
A. Yes.
Q. And that was basically the thing that he enjoyed do?
A. Right.
Q Did Jessie go with you when you went fishing as kids?
A. On occasions he would go.
Q. Do you still consider George a friend?
A. Yes, sir.
Q. And would George still be welcome in your house?
A. Any time.
MR. PERRY: I don't have any further questions.
THE COURT: Cross?
MR. BENITO: No questions.
THE COURT: You are excused, sir. You may step down.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993).
[2] The trial court acknowledged that analysis of the case was hampered by penalty phase counsel's limited personal recollection of the case and the loss of the public defender's case file.
[3] These conclusions now mirror those of a forensic psychologist, Dr. Craig Beaver, also presented by Hodges during the postconviction proceeding.
[4] Dr. Maher conceded that Hodges exhibited an emotional flatness during the initial evaluation prior to trial and that he must have simply missed the diagnosis at that time.
[5] Contrary to the view expressed in the dissenting opinion, there is ample record evidence in support of the conclusion that Hodges became uncooperative with counsel during the penalty phase. See dissenting op. at 364-65. In our initial decision affirming Hodges' conviction and sentence, this Court noted in the recitation of the pertinent facts that "[a]t the end of the defense presentation counsel told the court that Hodges had become uncooperative, and Hodges stated on the record that he did not want to testify in his own behalf." Hodges I, 595 So.2d at 931 (emphasis supplied). Indeed, the record shows that after the jury retired to commence sentencing deliberations, Hodges attempted to commit suicide. In the text of the suicide note he left, Hodges essentially admitted that he had failed to cooperate with counsel during the penalty phase. While Hodges' trial counsel testified during the postconviction hearing that Hodges was cooperative and unassuming, such testimony does not erase trial counsel's previous assessment of his client's behavior as uncooperative, and does not negate the other record evidence supporting this Court's determination that Hodges became uncooperative during the penalty phase, refusing to testify on his own behalf.
[6] We note that the records even contain a mixture of those related to Hodges and other members of his family. Conditions that may or may not relate to other family members cannot be attributed to Hodges by simply co-mingling records.
[7] The Court specifically noted that funds had been made available for Wiggins' trial counsel to retain a forensic social worker, but that counsel had chosen not to commission such a report. See id. at 524, 123 S.Ct. 2527.
[8] On a related topic, we decline to address Hodges' contention that guilt and penalty phase counsel were ineffective for failing to present evidence showing that Hodges' mental capacity prevented him from acting in a manner that is cold, calculated, and premeditated. This Court has held on numerous occasions that evidence of an abnormal mental condition not constituting legal insanity is inadmissible to negate specific intent. See, e.g., Spencer v. State, 842 So.2d 52, 63 (Fla.2003) (holding that evidence of defendant's disassociative state would not have been admissible during the guilt phase); Bunney v. State, 603 So.2d 1270, 1273 (Fla.1992) (reiterating that commission of a crime during an epileptic seizure constitutes an exception to the broad prohibition against diminished capacity defenses); Chestnut v. State, 538 So.2d 820, 821 (Fla.1989) (rejecting the argument that the defendant did not have the requisite mental state for premeditated murder as a result of extremely low intelligence, a seizure disorder, diminished cognitive skills, and a passive and dependent personality).
[9] These claims include: the jury instructions shifted the burden to Hodges to prove that the death sentence was inappropriate and the same standard was employed by the sentencing judge; Florida's death penalty statute is unconstitutional because aggravating factors are not charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt by a unanimous vote of the jury; and the death penalty statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty, violates due process, and constitutes cruel and unusual punishment.
[10] See Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002); Freeman, 761 So.2d at 1067; Sims v. State, 754 So.2d 657, 666-69 (Fla.2000); Provenzano v. Moore, 744 So.2d 413, 416 (Fla.1999); Fotopoulos v. State, 608 So.2d 784, 794 n. 7 (Fla.1992).
[11] Although the evidence that Hodges was the shooter was wholly circumstantial, there was no admissible evidence that Hodges was not responsible for the murder. However, it is troubling that Hodges has always steadfastly maintained his innocence and, six months before he was sentenced to death, voluntarily took and passed a polygraph examination regarding his denial of involvement in the murder.
[12] In fact, defense counsel did not object at all during the prosecutor's entire penalty phase closing argument.
[13] The trial judge characterized this finding as a "statutorily enumerated mitigating circumstance." Hodges, 595 So.2d at 934. However, as we noted in our 1992 opinion, the trial judge's finding was based on the statutorily enumerated consideration of "all aspects of the defendant's character, i.e., nonstatutory mitigating evidence." Id. Thus, as a practical matter, Hodges' mitigating evidence was entirely nonstatutory.
[14] In response to the majority's assertion that the evidence regarding the area was insufficiently tied to Hodges, his siblings testified during the postconviction hearing that the family consumed fish caught in a polluted river that ran near the Hodges' home and ate food foraged from a city dump laden with hazardous materials.
[15] Specifically, with regard to Hodges' impoverished childhood, Dr. Maher, the psychiatrist who evaluated Hodges both for trial and postconviction proceedings, testified:

When I speak of impoverishment here, I'm not speaking by any means exclusively of financial impoverishment, but impoverishment in terms of family structure, family values, having a clean, safe place to live, to sleep, academic impoverishment, and impoverishment in his relationships as a child essentially from the time he was born through his adolescence, and that that was of a nature which in the modern United States today is almost unheard of except in some very isolated areas.
[16] The majority relies on the fact that Hodges' counsel was more experienced than counsel in Rose and Ragsdale to distinguish those cases. However, I do not believe that counsel's experience should be determinative. To the contrary, the argument could be made that experienced counsel should be held to higher standards of competency, especially when it comes to penalty-phase investigation, which experienced counsel should know is critical to death penalty defense. Moreover, counsel could offer no strategic reason for anything he did or failed to do.
[17] To the extent that the majority's conclusion that Hodges was not cooperative is based on Hodges' suicide attempt during the penalty phase, I note that this attempt occurred after the presentation of evidence and while the jury was out deliberating the sentence recommendation. See Hodges, 595 So.2d at 931.
[18] Specifically, Dr. Maher's testimony could have helped to establish that Hodges was under the influence of extreme emotional disturbance at the time of the crime. See § 921.141(6)(b), Fla. Stat. (Supp.1988). Both mental health witnesses testified that although they believed Hodges' ability to appreciate the criminality of his conduct was impaired, it did not rise to the level required to establish the statutory mitigator.
[19] Justice Barkett concluded in 1992 that "the aggravating factors of witness elimination and cold, calculated, and premeditated [were] so intertwined here that they should [have been] considered as one." Hodges, 595 So.2d at 935 (Barkett, J., concurring in part, dissenting in part).
[20] In Hudson, this Court noted in a footnote that the defendant's contention that the prosecutor's use of a similar argument deprived the defendant of a fair trial was not supported by the record and, thus, did not constitute reversible error. 538 So.2d at 832 n. 6.
[21] In Jackson, this Court concluded that the prosecutor's comment that "the victims could no longer read books, visit their families, or see the sun rise in the morning as Jackson would be able to do if sentenced only to life in prison" was improper because it urged consideration of factors outside the scope of the jury's deliberations. 522 So.2d at 809.
[22] While I acknowledge that this Court has recently held in Brown v. State, 755 So.2d 616 (Fla.2000), that the failure to object to the type of argument condemned in Hodges, Taylor, and Jackson is not ineffective assistance of counsel, I conclude that Brown is distinguishable. In that case, this Court relied in part on the fact that defense counsel did not object to the argument because at the time of trial no case law had held the argument to be improper. See id. at 624-25. Indeed, as we specifically noted, Brown's trial took place in 1987, one year prior to the Jackson opinion. See id. at 623 n. 9. Thus, contrary to Hodges' counsel, who tried Hodges' case one year after the Jackson opinion, Brown's counsel did not have the benefit of Jackson.